ROSMAN & GERMAIN APC
Daniel L. Germain (Bar No. 143334)
5959 Topanga Canyon Boulevard
Suite 360
Woodland Hills, CA  91367-7503
Telephone: (818) 788-0877
Facsimile: (818) 788-0885
E-Mail: Germain@Lalawyer.com

Counsel for Plaintiffs and the Putative Class

[Additional Counsel Listed on Signature Page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARLENE LANGSTON, MICHAEL PHILLIPS, BRENDA PACLIK and CRYSTAL FRANKLIN, individually and on behalf of all others similarly situated, | CASE NO. |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | |
| COBHAM ADVANCED ELECTRONIC SOLUTIONS, INC., THE BOARD OF DIRECTORS OF COBHAM ADVANCED ELECTRONIC SOLUTIONS, INC., THE 401(K) PLAN COMMITTEE OF COBHAM ADVANCED ELECTRONIC SOLUTIONS, INC. and JOHN DOES 1-30. | |
| Defendants. | |

1   Plaintiffs, Arlene Langston, Michael Phillips, Brenda Paclik and Crystal
2   Franklin ("Plaintiffs"), by and through their attorneys, on behalf of the Cobham
3   United States 401(k) Plan (the "Plan"),[1] themselves and all others similarly situated,
4   state and allege as follows:

## I. INTRODUCTION

6   1.      This is a class action brought pursuant to §§ 409 and 502 of the
7   Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109
8   and 1132, against the Plan's fiduciaries, which include Cobham Advanced Electronic
9   Solutions, Inc. ("Cobham" or the "Company")[2], the Board of Directors of Cobham
10  Advanced Electronic Solutions, Inc. and its members during the Class Period
11  ("Board"), and the 401(k) Plan Committee of Cobham Advanced Electronic
12  Solutions, Inc. and its members during the Class Period ("Committee")[3] for breaches
13  of their fiduciary duties.

14  2.      To safeguard Plan participants and beneficiaries, ERISA imposes strict
15  fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.
16  29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the
17  law." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. Dec. 30, 2016) (*en banc*).

18  3.      The Department of Labor has explicitly stated that employers are held to
19  a "high standard of care and diligence" and must, among other duties, both "establish
20  a prudent process for selecting investment options and service providers" and

---

[1] The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

[2] Prior to November 5, 2020, the Plan Sponsor was Cobham Management Services, Inc., ("Cobham Services"). For periods prior November 5, 2020, Cobham shall refer to Cobham Services and similarly for periods subsequent to November 5, 2020 Cobham shall be used to refer to Cobham Advanced Electronic Solutions, Inc.

[3] As will be discussed in more detail below, the Class Period is from June 27, 2017 through the date of judgment.

"monitor investment options and service providers once selected to see that they continue to be appropriate choices." *See,* "*A Look at 401(k) Plan Fees,*" *supra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4.     Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.   In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."   Uniform Prudent Investor Act (the "UPIA"), § 7.

5.     "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v,. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, comment b).[4]

6.     Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees…lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

7.     The Supreme Court recently reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty

---

[4] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at:
https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-lookat-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

1  of some kind to monitor investments and remove imprudent ones" and a plaintiff may
2  allege that a fiduciary breached the duty of prudence by failing to properly monitor
3  investments and remove imprudent ones. *Hughes v. Northwestern Univ.*, 142 S.Ct.
4  737, 741 (2022).

5      8.    The Plan had over $746 million dollars in assets under management in
6  2017 and by the end of 2020 the Plan had grown to over $930 million in assets that
7  were/are entrusted to the care of the Plan's fiduciaries.    The Plan's assets under
8  management qualifies it as a jumbo plan in the defined contribution plan marketplace,
9  and among the largest plans in the United States.    In 2017, only 0.1 percent (623 of
10 569,257) of 401(k) plans in the country had between $500 million and $1 billion in
11 assets under management.[5] This figure remained constant to the end of 2019, by 2019
12 only 0.1 percent (726 of 603,217) of 401(k) plans in the country had between $500
13 million and $1 billion in assets under management.[6] As a jumbo plan, the Plan had
14 substantial bargaining power regarding the fees and expenses that were charged
15 against participants' investments.    Defendants, however, did not try to reduce the
16 Plan's expenses or exercise appropriate judgment to scrutinize each investment
17 option that was offered in the Plan to ensure it was prudent.

18     9.    Plaintiffs allege that during the putative Class Period (July 28, 2017
19 through the date of judgment) Defendants, as "fiduciaries" of the Plan, as that term is
20 defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they
21 owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*,
22 (1) failing to objectively and adequately review the Plan's investment portfolio with
23 due care to ensure that each investment option was prudent, in terms of cost;  and (2)

---

26 [5] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at
27 401(k) Plans, 2017 at Ex. 1.2, p. 13., available at:
   https://www.ici.org/system/files/attachments/20_ppr_dcplan_profile_401k.pdf.

28 [6] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at
   401(k) Plans, 2019 at Ex. 1.2, p. 7., available at:
   https://www.ici.org/system/files/2022-09/22-ppr-dcplan-profile-401k.pdf

maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories.

10.    Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104.   Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

11.    Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.    JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

13.    This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

14.    Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.   Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.    PARTIES

**Plaintiffs**

15.    Plaintiff, Arlene Langston ("Langston"), resides in Encinitas, California. During her employment, Plaintiff Langston participated and invested in

the options offered by the Plan that are challenged in this lawsuit. She suffered injury to her Plan account from the underperformance and excessive expense of these funds. In addition, Plaintiff Macias suffered injury to her Plan account by having to pay for her share of consulting fees to maintain any of the lower performing or expensive funds in the Plan whether specifically identified herein or not, as described below. Further, Plaintiff Macias suffered injury to her Plan account by the fact that her claim against her share of investments in the Plan is diminished by the underperforming and expensive funds which were left languishing in the Plan whether they are specifically identified herein or not. Under IRS regulations, a participant in any retirement plan regulated by ERISA, always maintains a claim in the form of an undivided interest against a plan's trust for his or her share of the investment. *See*, 26 CFR § 1.414(I)-1. The amount of this undivided interest is diminished for all participants when a plan is paying excessive fees and maintains expensive and/or underperforming funds, as alleged below. *Id*.

16.    Plaintiff, Michael Phillips ("Phillips"), resides in Lansdale, Pennsylvania. During his employment, Plaintiff Phillips participated and invested in the options offered by the Plan that are challenged in this lawsuit. Plaintiff Phillips specifically invested in the American Century target date series described herein. He suffered injury to his Plan account from the underperformance and excessive expense of these funds. In addition, Plaintiff Phillips suffered injury to his Plan account by having to pay for her share of consulting fees to maintain any of the lower performing or expensive funds in the Plan whether specifically identified herein or not, as described below. Further, Plaintiff Phillips suffered injury to his Plan account by the fact that his claim against his share of investments in the Plan is diminished by the underperforming and expensive funds which were left languishing in the Plan whether they are specifically identified herein or not. Under IRS regulations, a participant in any retirement plan regulated by ERISA, always maintains a claim in the form of an undivided interest against a plan's trust for his or her share of the

investment. *See*, 26 CFR § 1.414(I)-1. The amount of this undivided interest is diminished for all participants when a plan is paying excessive fees and maintains expensive and/or underperforming funds, as alleged below. *Id*.

17.    Plaintiff, Brenda Paclik ("Paclik"), resides in Fort Worth, Texas. During her employment, Plaintiff Paclik participated and invested in the options offered by the Plan that are challenged in this lawsuit. She suffered injury to her Plan account from the underperformance and excessive expense of these funds. Plaintiff Paclik specifically invested in the American Century target date series described herein. In addition, Plaintiff Paclik suffered injury to her Plan account by having to pay for her share of consulting fees to maintain any of the lower performing or expensive funds in the Plan whether specifically identified herein or not, as described below. Further, Plaintiff Paclik suffered injury to her Plan account by the fact that her claim against her share of investments in the Plan is diminished by the underperforming and expensive funds which were left languishing in the Plan whether they are specifically identified herein or not. Under IRS regulations, a participant in any retirement plan regulated by ERISA, always maintains a claim in the form of an undivided interest against a plan's trust for his or her share of the investment. *See*, 26 CFR § 1.414(I)-1. The amount of this undivided interest is diminished for all participants when a plan is paying excessive fees and maintains expensive and/or underperforming funds, as alleged below. *Id*.

18.    Plaintiff, Crystal Franklin ("Franklin"), resides in Acton, Massachusetts. During her employment, Plaintiff Franklin participated and invested in the options offered by the Plan that are challenged in this lawsuit. She suffered injury to her Plan account from the underperformance and excessive expense of these funds. Plaintiff Franklin specifically invested in the American Century target date series described herein. In addition, Plaintiff Franklin suffered injury to her Plan account by having to pay for her share of consulting fees to maintain any of the lower performing or expensive funds in the Plan whether specifically identified herein or not, as described

below. Further, Plaintiff Franklin suffered injury to her Plan account by the fact that her claim against her share of investments in the Plan is diminished by the underperforming and expensive funds which were left languishing in the Plan whether they are specifically identified herein or not. Under IRS regulations, a participant in any retirement plan regulated by ERISA, always maintains a claim in the form of an undivided interest against a plan's trust for his or her share of the investment. *See*, 26 CFR § 1.414(I)-1. The amount of this undivided interest is diminished for all participants when a plan is paying excessive fees and maintains expensive and/or underperforming funds, as alleged below. *Id*.

19.    Plaintiffs have standing to bring this action on behalf of the Plan because they participated and invested in the Plan and were injured by Defendants' unlawful conduct.  Further, Plaintiffs have standing because their claims against their share of investments in the Plan is diminished by the underperforming funds suffered by the Plan whether they are specifically identified herein or not, as discussed above. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

20.    Plaintiffs did not have knowledge of all material facts (including, among other things, what a competitive expense ratio is for funds in a retirement plan and how target date funds and other funds in a retirement plan should perform as compared to their peers and benchmarks) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

21.    Cobham is a named fiduciary of the Plan with a principal place of business being 5300 Hellyer Avenue, San Jose, California. The 2020 Form 5500 for

the Cobham United States 401(k) Plan ("2020 5500") at 1. According to its website, Cobham is a government contractor specializing in microwave and millimeter wave technologies for the aerospace and defense industries.[7] Cobham employs over 2,000 individuals in nine states throughout North America. *Id*

22.    Cobham appointed the Committee to, among other things, ensure that the investments available to the Plan's participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. Cobham Advanced Electronic Solution Inc., 401(k) Plan Committee Charter, dated October 23, 2020 ("Charter") at 1-2. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

23.    Accordingly, Cobham during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

24.    For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Board Defendants**

25.    Cobham, acting through its Board, appointed the Committee to, among other things, ensure that the investments available to the Plan's participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. Charter at 3-6. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

26.    Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty to monitor the actions of the Committee.

---

[7] https://caes.com/about last accessed on June 21, 2023.

27.     The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

28.     As discussed above, Cobham appointed the Committee to, among other things, ensure that the investments available to the Plans' participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. Charter at 3-6.

29.     The Charter goes on to further define the Committee's role in selecting and monitoring the investment choices available in the Plan as follows: "[t]he Committee shall … review and monitor the investment performance of the Plan …" Charter at 2.

30.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of the Plans' assets.

31.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**Additional John Doe Defendants**

32.      To the extent that there are additional officers, employees and/or contractors of Cobham who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Cobham officers, employees and/or contractors who are/were fiduciaries

of the Plans within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## IV.   CLASS ACTION ALLEGATIONS[8]

33.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[9]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plans, at any time between July 28, 2017 through the date of judgment (the "Class Period").

34.    The members of the Class are so numerous that joinder of all members is impractical.   The 2020 Form 5500 lists 5,713 Plan "participants with account balances as of the end of the plan year."  2020 Form 5500 at 2.

35.    Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plans. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

---

[8] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plan and all participants.  *See, e.g.*, *In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims).  ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[9] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

36.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

> A.     Whether Defendants are/were fiduciaries of the Plan;
>
> B.     Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;
>
> C.     Whether the Company and Partnership Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;
>
> D.     The proper form of equitable and injunctive relief; and
>
> E.     The proper measure of monetary relief.

37.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

38.     This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

39.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the

Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.    THE PLAN

40.    The Plan is a defined contribution plan covering substantially all eligible employees of Cobham. 2020 Auditor Report for the Cobham United States 401(k) Plan ("2020 Auditor Report") at 3. More specifically, the Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. *Id.* Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.  *Id.*

### *Eligibility*

41.    In general, the Plan covers substantially all employees of Cobham from the first day of employment. *Id.*

### *Contributions*

42.    There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, discretionary profit-sharing contributions and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions. *Id.*

43.    With regard to employee contributions, participants can elect to make annual pre-tax and Roth contributions subject to Internal Revenue Service ('IRS') limitations. *Id.* With regard to pre-tax contributions made by the employer, Cobham matches half of the contribution made by each employee up to 2% of total compensation. *Id.*

44.    Like other companies that sponsor a 401(k) plan for their employees, Cobham enjoys both direct and indirect benefits by providing matching contributions to the Plan's participants.  Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

45.    Cobham's employees benefit in other ways from the Plan's matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

46.    Given the size of the Plan, Cobham likely enjoyed a significant tax and cost savings from offering a match.

### Vesting

47.    Participants are automatically vested in any contributions they made to their accounts themselves. 2020 Auditor Report at 4. However, matching contributions made by Cobham, as of January 1, 2019, are considered immediately vested. *Id.* Contributions made by Cobham after January 1, 2019 were subject to a three year vesting schedule. *Id.*

### The Plans' Investments

48.    In theory, the Committee determines the appropriateness of the Plan's investment offerings and monitors investment performance at least yearly. Charter at 2. As will be discussed in more detail below, the Committee fell well short of these fiduciary goals.

49.    Several funds were available to the Plan's participants for investment each year during the putative Class Period.  Specifically, a participant may direct all contributions to selected investments as made available and determined by the Committee.

50.    At the Plan's fiscal year end in 2020, the Plan had over $930 million in assets under management that were/are entrusted to the care of the Plan's fiduciaries. 2020 Auditor Report at 2.

**Payment of the Plan's Expenses**

51.    During the Class Period, administrative expenses were paid by using Plan assets. 2020 Auditor Report at 6.

## VI.  THE PLAN'S FEES AND INVESTMENT PERFORMANCE DURING THE CLASS PERIOD WERE UNREASONABLE

### A. The Totality of the Circumstances Demonstrates that the Plan's Fiduciaries Failed to Administer the Plan in a Prudent Manner

52.    As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

53.    ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exist "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S.Ct. at 741.

54.    Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plan's investments because this information is solely within the possession of Defendants prior to discovery.  *See, Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

55.    In fact, in an attempt to discover the details of the Plan's mismanagement, Plaintiffs wrote to the Defendants to request, among other things, the Committee's meeting minutes.  This request was made on April 28, 2022. By letter dated May 26, 2022, Cobham failed to provide meeting minutes in response to Plaintiffs' request.

56.    Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process.  But in most cases, even that is not sufficient.  For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence.  Deliberative processes can vary in quality or can be followed in bad faith.  In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

57.    For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon several factors.

58.    As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries.  Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services…"  DOL 408(b)(2) Regulation Fact Sheet.

59.    "The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[10]

---

[10] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false.

CLASS ACTION COMPLAINT

60.    Here, Defendants did not engage in a prudent process in evaluating investment management fees and the prudence of the Plan's funds.

**(A)    Defendants Breached Their Fiduciary Duties by Selecting and Retaining in the Plan's Lineup the Chronically Underperforming American Century Series of Target Date Funds**

**1.    The Use of Target Date Funds in 401(k) Plans**

61.    Defendants caused the Plan to include in its menu of investment offerings the materially underperforming American Century target date suite whether it was the mutual fund version or the collective investment trust version.  Both had a nearly identical asset portfolio and managers with the primary difference being expense (hereinafter the entire series will be referred to as the "American Century Target Date Series[11]," when referred to collectively). The performance histories of these funds were mediocre when compared to their appropriate peer groups.

62.    Target date funds are designed to provide a single diversified investment vehicle for plan participants. Target date funds are offered as a suite of funds, with each fund based on the participant's anticipated retirement date.

63.    The first target date funds in the industry were offered as early as 1994, and since then the market for target date funds has exploded with numerous investment managers offering a variety of different target date fund investments.

---

[11] During the Class Period, the Plan offered the collective investment trust version of the American Century Target Date Series known as the American Century Retirement Date Trust series. Since information about this share class of the American Century Target Date Series isn't publicly available, throughout this Complaint, reference will be made to the lowest expense share class of the American Century Target Date Series being the American Century One Choice Date R6 series which provides information to the public. This fund has nearly identical managers and underlying investments as the rest of the American Century Target Date Series making it an accurate comparison.

64.     By the mid-2000s, many target date funds with established performance histories were available to defined contribution plans. By 2009, several target date funds had performance histories of five years or more.

65.     Multiple types of assets are included in a target date fund portfolio, including equity (stock) and fixed income (bond) securities. Target date funds offer diversity and balanced exposure to a broad array of underlying securities included in the fund.

66.     An investment in a single target date fund can be attractive to plan participants who do not want to actively manage their retirement savings and periodically convert to more conservative holdings as their retirement date draws near. Target date funds automatically rebalance their portfolios to become more conservative as the participant gets closer to retirement.

67.     This rebalancing occurs based on the fund's "glide path." A glide path determines how the fund's target asset allocations across the underlying securities are expected to change over time and how they become more conservative as the target retirement date approaches.

68.     The target date refers to the participant's expected retirement year. For example, "target date 2030" funds are designed for individuals who intend to retire in 2030. As the year 2030 approaches, the fund's investment manager adjusts the underlying asset mix to become more conservative.

69.     Target date funds are divided into two broad categories based on the fund's glide path: "To" and "Through" target date funds. A "To" target date fund is designed to allocate its underlying assets to the most conservative investments at the year of the expected retirement. In contrast, a "Through" target date fund continues its glidepath progression to reach its most conservative asset allocation past the expected retirement date. This method focuses on the life expectancy of the participant rather than the retirement date.

70. The American Century Target Date Series are "Through" funds.

71. Regardless of the type of target date fund, the development of a target date fund's glide path and the corresponding asset allocations are important components of a target date fund. Constructing and maintaining a proper glide path and prudent asset allocation for target date funds is complex, time-consuming, and requires input from actuaries and other qualified investment professionals.

72. Another broad classification of target date funds is "actively" or "passively" managed funds. With an actively managed fund, the portfolio manager attempts to select stocks or bonds to generate investment returns that exceed the relevant benchmark index return. With a passively managed fund, the portfolio manager attempts to mimic the performance of a relevant benchmark index. No discretion or research is needed for passive funds, in contrast to actively managed funds. Because of this, passive or index funds charge a much lower investment management fee and have a lower total "expense ratio" relative to active funds.[12]

73. For all target date funds, diversions from a determined glide path or significant changes in the underlying assets or asset allocations can have an extremely negative impact on wealth aggregation for investors. This impact can be particularly profound for participants in a 401(k) plan.

74. It is well known in the investment industry that 401(k) participants rarely make trades in their 401(k) accounts. A fiduciary, held to the standard of an investment professional, therefore must ensure that an investment option added to a 401(k) plan's suite of investments remains prudent and in the best interest of plan participants.

---

[12] The fees of mutual funds and similar investment alternatives are usually expressed as a percentage of assets under management, or "expense ratio." For example, if the fund deducts 1% of fund assets each year in fees, the fund's expense ratio would be 1%, or 100 basis points ("bps"). One basis point is equal to 1/100th of one percent.

CLASS ACTION COMPLAINT

75.    A fiduciary's duty to ensure that a prudent target date fund is offered to plan participants is heightened when considering the circumstances in which these funds are used by participants. Given the structure of target date funds, participants often invest all their retirement assets in a single target date fund that matches their retirement date. Some plans, like the Plan, make target date funds the default selection if plan participants do not select a specific fund within the 401(k) plan's lineup of investments. The use of a plan's target date funds as the default investment option underscores the importance of a prudent and diligent process of monitoring target date funds by plan fiduciaries.

76.    A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. This process includes a requirement for the fiduciary to regularly evaluate the fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

77.    With respect to investment returns, diligent investment professionals monitor the performance of their selected target date funds using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

78.    The measurement of target date funds against prudently managed alternatives is critical given that these alternatives represent other target date funds available to the plan, which may be a more appropriate choice to meet participants' retirement needs.

79.    Given the construction and composition of target date funds, diligent investment professionals must perform ongoing analyses and monitoring to ensure that the selected target date funds remains prudent options after their initial selection and insertion into the plan's suite of choices.

80.     During periods of underperformance, diligent investment professionals closely analyze the causes of the underperformance through attribution analyses. Causes or contributing factors are identified and analyzed.

81.     By 2010, multiple investment firms and banks offered target date funds with established and consistent performance histories, stable and experienced management, and discrete changes to the underlying assets and allocations.

82.     Established target date fund investment managers include, but are not limited to, American Funds, T.Rowe Price and Mutual of America. American Funds and T.Rowe have each offered target date funds for nearly 20 years with Mutual of America's offering being closer to 15 years and those target date funds have provided stable investment returns to 401(k) plan participants.

### (2)     The American Century Series of Target Date Funds Chronically Underperformed

83.     At all relevant times, Defendants maintained the authority to exercise control over the Plan's investments, including the Plan's target date fund investment options.

84.     At all relevant times during the Class Period, the Plan maintained the American Century Target Date Series.

85.     In 2020, the 401(k) Plan held approximately $155 million dollars in the American Century Target Date Series. 2020 401(k) Plan Auditor Report at 10. With such a large amount invested in the target date series, the Plan would have been able to choose virtually any available target date series for the Plan.

86.     The American Century Target Date Series are the only target date investing options in the Plan. In other words, participants in the Plan who want to invest in a target date strategy have no choice other than the American Century Target Date Series.

87.     Defendants were under an obligation under ERISA to carefully vet the American Century Target Date Series before selecting them for inclusion in the Plan.

Defendants were also under a continuing obligation under ERISA to carefully monitor and scrutinize the performance of the American Century Target Date Series on an ongoing basis thereafter.

>    (a)    **The American Century Target Date Series Materially Underperformed Relative to Comparator Target Date Funds and Indexes**

88.    The American Century Target Date Series consistently materially underperformed industry-accepted benchmarks for target date funds used by investment professionals.

89.    The American Century Target Date Series can be compared to various similar target date funds ("Comparator Funds") and relevant indexes ("Comparator Indexes") as benchmarks. Suitable Comparator funds include the T.Rowe Price Retirement target date suite, the American Funds target date suite and the Mutual of America target date suite. These three target date suites are suitable Comparator Funds to the American Century Target Date Series because Morningstar, the most well respected and accepted financial industry fund database places all three funds in the Morningstar Lifetime Moderate Index category.

90.    A Morningstar Category is assigned by placing funds [*e.g.*, Mutual of America target date suite, T.Rowe Price Retirement target date suite and the American Funds target date suite etc.] into peer groups based on their underlying holdings. The underlying securities in each portfolio are the primary factor in [Morningstar's] analysis . . . .  Funds are placed in a category based on their portfolio statistics and compositions over the past three years. Analysis of performance and other indicative facts are also considered." *See* Morningstar's summary of the Northern Trust Focus 2045 Fund, filed in *Allegretti v. Walgreen Co. et al*., No. 19-cv-05392 at Dkt. 43 ECF pg. 28 (N.D. Ill. Dec. 6, 2019). The analysis in *Allegretti* similarly deals with the Morningstar Lifetime Moderate Index category. *Id.*

91.    Further, Morningstar itself states that it created its categories "to help

investors make meaningful comparisons between mutual funds. Morningstar found that the investment objective listed on a fund's prospectus often did not adequately explain how the fund was actually invested." Morningstar Category Classification, 31 March 2022 ("Morningstar Classifier")[13] at page 5. The Morningstar Classifier goes on to state that "[f]or example, many funds claimed to be seeking "growth," but some of those were investing in established blue-chip companies while others were investing in small-cap companies." *Id.*

92.    Another valuable Comparator Index is the S&P Target Date Index. The S&P Target Date Index is a prominent and widely-accepted target date benchmark for "Through" target date funds. It provides exposure to equities, bonds, and other asset classes.[14] The S&P Target Date Index is used as the primary benchmark for many target date funds throughout the industry. At least one large holder of target date funds in the Lifetime Moderate Index category uses the S&P Target Date Index as the benchmark index held in its 401(k) plan.[15]

93.    A prudent fiduciary should have used some or all of these benchmarks, or substantially similar benchmarks, to evaluate the performance of the American Century Target Date Series as early as the inception of the Class Period, or sooner, and on an ongoing basis thereafter.

---

[13] Available at the following web address: https://advisor.morningstar.com/Enterprise/VTC/MorningstarCategoryClassificationforFunds_April2022.pdf. Last accessed on May 12, 2023.

[14] *See, e.g.,* https://www.spglobal.com/spdji/en/indices/multi-asset/sp-target-date-2035-index/#overview (Factsheet for S&P Target Date 2035 Index) (last visited October 27, 2022).

[15] *See* Complaint in *Allegretti v. Walgreen Co. et al.*, No. 19-cv-05392 at Dkt. 1 ¶ 46 (N.D. Ill. Aug. 9, 2019) ("According to Plan documents, the [Walgreen 401(k)] Plan uses the S&P Target Date Index as the investment benchmark for each of the Northern Trust [Focus] Funds." The Northern Trust [Focus] Funds are relevant here because Morningstar places them in the same category, namely, the Lifetime Moderate Index category.

94.     The performance of the American Century Target Date Series lagged behind the performance of the applicable Comparator Funds for many years before the inception of the Class Period clearly showing that it was an imprudent choice for the Plan.

95.     The yearly performance as early as 2014, well before the inception of the Class Period, shows that the American Century Target Date Series have been historically an imprudent selection. Using target date 2040 as a sample target date year[16], it's clear that out of more than 200 Morningstar peer funds in the LT Mod target date group, the American Century Target Date Series was mediocre, at best. Here, three target date series from this Morningstar peer group will be analyzed, namely T.Rowe Price Retirement 2040 (TRRDX), Mutual of America 2040 (MURLX) and the American Funds 2040 Target Retirement R6 (RFGTX) ("collectively the "Three Comparator Funds") as against the sample year for the American Century Target Date Series, namely the American Century Once Choice 2040 R6 (ARDUX).

96.     As can be seen from the graph below, comparing the performance of the Three Comparator Funds and their performance to the appropriate Morningstar Index, Morningstar Lifetime Moderate Index, MSAAM40M, ("Morningstar Index"), it's clear the American Century Target Date Series performed poorly as compared to its peers and generally below its Morningstar Index while the comparator funds performed well above. The graph below, using Morningstar data, assumes an initial investment of $10,000 at the end of 2012 and tracks the performance of the funds and Morningstar Index on a monthly basis up to the end of 2017[17].

//

---

[16] A complete analysis for each target date year beginning in 2025 to 2060 is attached hereto as Appendix "A."

[17] American Century Once Choice 2040 R6 (ARDUX) is in dark blue and generally appears at the bottom of the graph while the other funds and the Morningstar Index are above it. For example, the Morningstar Lifetime Moderate Index, MSAAM40M is in purple and as can be seen in the graph, in the first quarter of 2015, MSAAM40M is slightly above ARDUX in blue.





97.     Based on data available to the Defendants years before the Class Period, it's clear that the American Century Target Date Series were an imprudent choice for the Plan costing Plan participants millions in retirement savings over the Class Period. That is because as of the middle of 2012, based on the chart above, the American Century Target Date Series were performing below its Morningstar Index, a fact which became more and more apparent as of 2013 and 2014, years before the beginning of the Class Period. The Three Comparator Funds are only a few examples of potentially nearly 100 funds in the Morningstar Lifetime Moderate Index category that would have been a much better choices for inclusion in the Plan.

98.     To make matters worse, the American Century Once Choice 2040 R6 (ARDUX) ranked poorly as compared to its peers in its Morningstar Category. For example, in 2016, prior to the Class period, this fund ranked in the 68th percentile out of 221, or 150th out of 221, funds in the Lifetime Mod 2040 TR category maintained by Morningstar. In 2017, it ranked in the 96th percentile being ranked only higher than 9 of a possible 234 funds in that category in that year. Pointing out some of its worst years, in 2018 it ranked in the 82nd percentile, in 2021 it ranked in the 95th percentile and, thus far into 2023, it's ranking in the 89th percentile. It did have some

1  years where it ranked higher but this is only evidence of the instability of the funds

2  especially where it clearly ranked poorly more times than it had ranked higher.

3  Similar results are seen for the remaining target date years that are part of the

4  American Century Target Date Series.

5      99.    This trend of clear underperformance continued from 2017 to the

6  present. Again, setting a $10,000 investment three years prior to the analysis period,

7  we see that by 2017, again, the American Century Target Date Series chronically

8  underperformed the three Comparator Funds and the Morningstar Index. There's no

9  justifiable reason why the American Century Target Date Series would have been

10 selected and maintained in the Plan given the data that was available to the Plan's

11 fiduciaries prior to the Class Period and during the Class Period. This

12 underperformance is demonstrated in the graph below.



23      100.    No matter how the American Century Target Date Series is analyzed, it

24 appears that at not point did any of the superior Comparator Funds perform worse

25 than the median in their Morningstar category. In fact, at any point in time, the four

26 Comparator Funds significantly outperformed the Morningstar Index. However, from

27 at least 2013 to the present, the American Century Target Date Series rarely

28 preformed better than the Morningstar Index. This fund should not have been selected

for the Plan and should have been replaced with one of the superior performing alternatives, out of potentially nearly 100 or more superior performing funds, as discussed above.

### (3)    Several of the Non-target Date Funds in the Plan had Similarly Poor Performance Histories

101.    Similar to the performance issues seen with regard to the American Century Target Date Series, there were several non-target date funds that significantly underperformed their peers.

### (a)    The International Growth Fund

102.    Since the beginning of the Class Period the Plan included the chronically underperforming American Funds Europacific Growth Fund (RERGX). Similar to the American Century Target Date Series, this fund chronically underperformed its peers for years prior to the inception of the Class Period. Beginning in 2016, using a hypothetical $10,000 invested at the end of 2012, it's clear that at least two funds in the appropriate Morningstar Category began to materially outperform the Europacifc Growth fund, namely, the Clear Bridge International Growth I fund (LMGNX in red) and the William Blair International Ldrs R6 fund (WILJX in green). This is seen in the Morningstar graph below:



CLASS ACTION COMPLAINT

103.    To make matters worse, from 2013 forward, the Europacific Growth fund had some of the worst rankings in its peer group. In 2015 it ranked in the 66th percentile out of 361 funds in the Morningstar Foreign Large Growth category, or, in other words, 238 funds had better rankings in 2015. In 2018 and 2019, the fund ranked in the 58th and 59th percentile, respectively, and in 2021 the fund ranked in the 80th percentile. The fund only ranked above the 38th percentile in 2016 and again in 2020, however, this is only further evidence of the funds lack of stability. The low rankings prior to the inception of the Class Period and the availability of better performing funds should have been sufficient evidence for the Plan fiduciaries to have replaced this fund as early as the inception of the Class Period. All the evidence discussed above was in fact available to them at all relevant times during the Class Period.

104.    The underperformance continued from 2018 to the present. Again, using a standard investment of $10,000 three years prior to 2018 shows that in addition to the Comparator Funds in the graph above, several more funds became clear superior alternatives to the Europacific Growth fund, namely the MFS International Growth R6 fund (MGRDX in light blue), Vanguard International Growth Adm (VWILX in purple) and the PGIM Jennison International Opps R6 (PWJQX in orange). This underperformance is demonstrated in the graph below:





105.   Accordingly, at the very least the fund should have been replaced early in the Class Period if not at the beginning. By early 2018, several funds in this Morningstar category began to significantly outperform the Europacific growth fund confirming that the fund should have been replaced.

106.   Had the Plan fiduciaries been tracking the performance of this fund as they should have, it would have been replaced as early as the beginning of the Class Period. The fund was showing clear signs of performance issues years prior to the beginning of the Class Period. This is the same real time data the Plan fiduciaries would have had access to in the years leading up to the Class Period and during the Class Period.

### (b)   The Large Cap Growth Fund

107.   Similarly, since the beginning of the Class Period, the Plan included the chronically underperforming Fidelity Contrafund (FCNTX) in the Morningstar Large Cap Growth category.

108.   Similar to the International Growth Fund, this fund chronically underperformed its peers for years prior to the inception of the Class Period. Beginning in 2016, using a hypothetical $10,000 invested at the end of 2012, it's

clear that at least two funds in the Morningstar Large Cap Growth began to materially outperform the Fidelity Contrafund (FCNTX), namely, the Fidelity Blue Chip Growth K fund (FBGKX in red) and the Vanguard US Growth Admiral fund (VWUAX in green). This is seen in the Morningstar graph below:



109.    To make matters worse, from 2013 forward, the Fidelity Contrafund had some of the worst rankings in its peer group. In 2014 it ranked in the 56th percentile out of 1,710 funds in the Morningstar Large Growth category, or, in other words, 957 funds had better rankings in 2015. In 2018 and 2019, the fund ranked in the 50th and 70th percentile, respectively. The fund only ranked above the 42nd percentile in 2015, in 2017 and again in 2021, however, this is only further evidence of the funds lack of stability. The low rankings prior to the inception of the Class Period and the availability of better performing funds should have been sufficient evidence for the Plan fiduciaries to have replaced this fund as early as the inception of the Class Period. All the evidence discussed above was in fact available to them at all relevant times during the Class Period.

110.    The underperformance continued from 2018 to the present. Again, using a standard investment of $10,000 three years prior to 2018 shows that in addition to the Comparator Funds in the graph above, several more funds became clear superior

alternatives to the Fidelity Contrafund, namely the Fidelity Advisor Growth Opps Z (FZAHX in bright blue) and the JPMorgan Large Cap Growth R6 (JLGMX in purple). This underperformance is demonstrated in the graph below:



111.   Accordingly, at the very least the fund should have been replaced early in the Class Period if not at the beginning. By early 2018, several funds in this Morningstar category began to significantly outperform the Fidelity Contrafund confirming that the fund should have been replaced.

112.   Had the Plan fiduciaries been tracking the performance of this fund as they should have, it would have been replaced as early as the beginning of the Class Period. The fund was showing clear signs of performance issues years prior to the beginning of the Class Period, this is the same real time data the Plan fiduciaries would have had access to in the years leading up to the Class Period and during the Class Period.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## FIRST CLAIM FOR RELIEF
### Breaches of Fiduciary Duty of Prudence
### (Asserted against the Committee)

113.   Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

114.   At all relevant times, the Committee and its members during the Class Period ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

115.   As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).   These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

116.   The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint such as failing to make decisions regarding the performance of the funds in the Plan.

117.   The failure to engage in an appropriate and prudent process resulted in saddling the Plan and its participants with poorly performing funds.

118.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs. Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

119.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

120.    The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against Cobham and the Board Defendants)**

121.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

122.    Cobham and the Board Defendants (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

123.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

124.    The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their

duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

125.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

      (a)    Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

      (b)    failing to monitor the processes by which Plan investments were evaluated; and

      (c)    failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and the Plan participants' retirement savings.

126.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses. Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

127.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiff's counsel as Class Counsel;

C.    A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.    An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.    An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

1       H.    Other equitable relief to redress Defendants' illegal

2 practices and to enforce the provisions of ERISA as may be

3 appropriate, including appointment of an independent fiduciary or

4 fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to

5 have breached their fiduciary duties;

6       I.    An award of pre-judgment interest;

7       J.    An award of costs pursuant to 29 U.S.C. § 1132(g);

8       K.    An award of attorneys' fees pursuant to 29 U.S.C. §

9 1132(g) and the common fund doctrine; and

10       L.    Such other and further relief as the Court deems equitable

11 and just.

**ROSMAN & GERMAIN APC**

Dated: July 28, 2023     /s/ Daniel L. Germain

Daniel L. Germain
5959 Topanga Canyon Boulevard
Suite 360
Woodland Hills, CA 91367-7503
Telephone: (818) 788-0877
Fax: (818) 788-0885
E-mail: Germain@lalawyer.com

**CAPOZZI ADLER, P.C.**

/s/ Donald R. Reavey
Donald R. Reavey, Esquire
(***Pro Hac Vice* admission to be applied for**)
PA Attorney ID #82498
2933 North Front Street
Harrisburg, PA 17110
Telephone: (717) 233-4101
Fax: (717) 233-4103
Email: donr@capozziadler.com

- 36 -
CLASS ACTION COMPLAINT

1

2              /s/ *Mark K. Gyandoh*

3              Mark K. Gyandoh, Esquire

               (***Pro Hac Vice* admission to be applied for)**

4              PA Attorney ID # 88587

               **CAPOZZI ADLER, P.C.**

5              312 Old Lancaster Road

6              Merion Station, PA 19066

               Telephone: (610) 890-0200

7              Fax: (717) 233-4103

8              Email:  markg@capozziadler.com

9              Counsel for Plaintiffs and the Putative Class

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT

## Appendix "A"

| Name | Ticker | Total Return 2017 | Total Return 2018 | Total Return 2019 | Total Return 2020 | Total Return 2021 |
|------|--------|-------------------|-------------------|-------------------|-------------------|-------------------|
| **American Century One Choice 2025 R6** | **ARWDX** | 12.56% | -4.63% | 17.77% | 11.75% | 9.73% |
| Mutual of America 2025 Retirement Fund | MURHX | 14.42% | -5.22% | 19.79% | 10.26% | 11.96% |
| American Funds 2025 Trgt Date Retire R6 | RFDTX | 15.33% | -3.47% | 17.85% | 13.67% | 11.44% |
| T. Rowe Price Retirement I 2025 I | TRPHX | 17.82% | -5.54% | 21.15% | 14.62% | 12.04% |
| **American Century One Choice 2030 R6** | **ARCUX** | 13.74% | -5.14% | 18.99% | 13.07% | 10.44% |
| Mutual of America 2030 Retirement Fund | MURIX | 16.00% | -6.49% | 21.93% | 11.67% | 15.29% |
| American Funds 2030 Trgt Date Retire R6 | RFETX | 18.40% | -4.16% | 20.06% | 15.16% | 13.16% |
| T. Rowe Price Retirement I 2030 I | TRPCX | 19.52% | -6.16% | 22.68% | 15.92% | 13.75% |
| **American Century One Choice 2035 R6** | **ARLDX** | 14.92% | -5.79% | 20.37% | 14.36% | 11.13% |
| Mutual of America 2035 Retirement Fund | MURJX | 17.13% | -7.36% | 23.62% | 12.61% | 17.84% |
| American Funds 2035 Trgt Date Retire R6 | RFFTX | 21.04% | -5.14% | 23.29% | 17.55% | 15.54% |
| T. Rowe Price Retirement I 2035 I | TRPJX | 21.03% | -6.81% | 23.90% | 17.04% | 15.28% |
| **American Century One Choice 2040 R6** | **ARDUX** | 16.29% | -6.19% | 21.71% | 15.54% | 11.90% |
| Mutual of American 2040 Retirement Fund | MURLX | 17.38% | -7.94% | 24.25% | 13.43% | 19.89% |
| American Funds 2040 Trgt Date Retire R6 | RFGTX | 21.98% | -5.52% | 24.40% | 18.77% | 16.83% |
| T. Rowe Price Retirement I 2040 I | TRPDX | 22.11% | -7.21% | 24.89% | 18.16% | 16.58% |
| **American Century One Choice 2045 R6** | **ARDOX** | 17.85% | -6.86% | 23.16% | 16.78% | 12.71% |

| | | | | | | |
|---|---|---|---|---|---|---|
| Mutual of American 2045 Retirement Fund | MURMX | 17.60% | -8.29% | 24.54% | 13.31% | 20.57% |
| American Funds 2045 Trgt Date Retire R6 | RFHTX | 22.44% | -5.58% | 24.68% | 19.21% | 17.18% |
| T. Rowe Price Retirement I 2045 I | TRPKX | 22.55% | -7.51% | 25.52% | 18.72% | 17.43% |
| **American Century One Choice 2050 R6** | **ARFEX** | 18.93% | -7.35% | 24.38% | 17.94% | 13.74% |
| Mutual of American 2050 Retirement Fund | MURNX | 17.85% | -8.74% | 24.65% | 13.39% | 20.82% |
| American Funds 2050 Trgt Date Retire R6 | RFITX | 22.61% | -5.61% | 25.04% | 19.42% | 17.27% |
| T. Rowe Price Retirement I 2050 I | TRPMX | 22.55% | -7.51% | 25.57% | 18.72% | 17.54% |
| **American Century One Choice 2055 R6** | **AREUX** | 19.36% | -7.66% | 24.85% | 18.41% | 14.25% |
| Mutual of American 2055 Retirement Fund | MUROX | 17.97% | -8.88% | 24.40% | 13.93% | 21.11% |
| American Funds 2055 Trgt Date Retire R6 | RFKTX | 22.63% | -5.65% | 25.09% | 19.39% | 17.28% |
| T. Rowe Price Retirement I 2055 I | TRPNX | 22.57% | -7.50% | 25.52% | 18.68% | 17.57% |
| **American Century One Choice 2060 R6** | **ARGDX** | **19.71%** | **-7.87%** | **25.45%** | **18.46%** | **14.74%** |
| Mutual of American 2060 Retirement Fund | MURPX | -- | -- | 24.53% | 14.08% | 21.60% |
| American Funds 2060 Trgt Date Retire R6 | RFUTX | 22.49% | -5.64% | 25.01% | 19.44% | 17.19% |
| T. Rowe Price Retirement I 2060 I | TRPLX | 22.53% | -7.44% | 25.48% | 18.79% | 17.55% |