

**ROSMAN & GERMAIN APC**
Daniel L. Germain (Bar No. 143334)
5959 Topanga Canyon Boulevard
Suite 360
Woodland Hills, CA  91367-7503
Telephone: (818) 788-0877
Facsimile: (818) 788-0885
E-Mail: Germain@Lalawyer.com

Counsel for Plaintiffs and the Putative Class

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

MICHAEL PHILLIPS, BRENDA PACLIK and CRYSTAL FRANKLIN, individually and on behalf of all others similarly situated,

        Plaintiffs,

   v.

CAES SYSTEMS, LLC, THE BOARD OF DIRECTORS OF CAES SYSTEMS, LLC, THE 401(K) PLAN COMMITTEE OF CAES SYSTEMS, LLC, COBHAM ADVANCED ELECTRONIC SOLUTIONS, INC., THE BOARD OF DIRECTORS OF COBHAM ADVANCED ELECTRONIC SOLUTIONS, INC., THE 401(K) PLAN COMMITTEE OF COBHAM ADVANCED ELECTRONIC SOLUTIONS, INC. and JOHN DOES 1-50.

        Defendants.

CASE NO. 5:23-cv-03785-EJD

~~SECOND~~THIRD AMENDED CLASS ACTION COMPLAINT

- 1 -

1    Plaintiffs, Michael Phillips, Brenda Paclik and Crystal Franklin ("Plaintiffs"), by

2    and through their attorneys, on behalf of the CAES 401(k) Plan (the "Plan"),[1]

3    themselves and all others similarly situated, state and allege as follows:

## I.    INTRODUCTION

5    1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee

6    Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132,

7    against the Plan's fiduciaries, which include CAES Systems, LLC and/or Cobham

8    Advanced Electronic Solutions, Inc. ("Cobham" or the "Company")[2], the Board of

9    Directors of CAES Systems, LLC and/or the Board of Directors of Cobham Advanced

10    Electronic Solutions, Inc. and its members during the Class Period ("Board")[3], and the

11    401(k) Plan Committee of CAES Systems, LLC and/or the 401(k) Plan Committee of

12    Cobham Advanced Electronic Solutions, Inc. and its members during the Class Period

13    ("Committee")[4] for breaches of their fiduciary duties.

---

[1] Prior to January 1, 2023, the Plan was known as the Cobham United States 401(k) Plan. Because much of the conduct described herein occurred prior to January 1, 2023, the defined term "Plan" shall refer to both the Cobham United States 401(k) Plan during the time the Plan carried that name and the CAES 401(k) Plan from January 1, 2023 forward. The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

[2] Prior to November 5, 2020, the Plan Sponsor was Cobham Management Services, Inc., ("Cobham Services"). For periods prior to November 5, 2020, Cobham or Company shall refer to Cobham Services and similarly for periods subsequent to November 5, 2020 up to January 1, 2023, the defined term Cobham or Company shall be used to refer to Cobham Advanced Electronic Solutions, Inc. In addition, for periods subsequent to January 1, 2023, the defined term Cobham or Company shall refer to CAES Systems, LLC who was the Plan Sponsor after that date.

[3] For periods prior to January 1, 2023, the defined term Board shall refer to the Board of Directors of Cobham Advanced Electronic Solutions, Inc. and for periods subsequent to January 1, 2023, the defined term Board shall refer to the Board of Directors of CAES Systems, LLC or a related entity having a board of directors that acts in that capacity or a similar capacity for CAES Systems, LLC.

[4] For periods prior to January 1, 2023, the defined term Committee shall refer to the 401(k) Plan Committee of Cobham Advanced Electronic Solutions, Inc. and for periods subsequent to January 1, 2023, the defined term Committee shall refer to the 401(k) Plan Committee of CAES Systems, LLC or similar entity exercising control over Plan assets. As will be discussed in more detail below, the Class Period is from July 28, 2017 through the date of judgment.

1    2.    To safeguard Plan participants and beneficiaries, ERISA imposes strict

2  fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  29

3  U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law."

4  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. Dec. 30, 2016) (*en banc*).

5    3.    The Department of Labor has explicitly stated that employers are held to

6  a "high standard of care and diligence" and must, among other duties, both "establish

7  a prudent process for selecting investment options and service providers" and "monitor

8  investment options and service providers once selected to see that they continue to be

9  appropriate choices."  *See*, "*A Look at 401(k) Plan Fees*," *supra*, at n.3; *see also Tibble*

10  *v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (reaffirming the ongoing fiduciary duty

11  to monitor a plan's investment options).

12    4.    Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial

13  consideration to the cost of investment options.  "Wasting beneficiaries' money is

14  imprudent.    In devising and implementing strategies for the investment and

15  management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent

16  Investor Act (the "UPIA"), § 7.

17    5.    "The Restatement … instructs that 'cost-conscious management is

18  fundamental to prudence in the investment function,' and should be applied 'not only

19  in making investments but also in monitoring and reviewing investments.'"  *Tibble v,.*

20  *Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement

21  (Third) of Trusts, § 90, cmt. b).[5]

22    6.    Additional fees of only 0.18% or 0.4% can have a large effect on a

23  participant's investment results over time because "[b]eneficiaries subject to higher

24

---

25  [5] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available

26  at

https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-

27  center/publications/a-lookat-401k-plan-fees.pdf (last visited February 21, 2020) ("You

28  should be aware that your employer also has a specific obligation to consider the fees

and expenses paid by your plan.").

SECONDTHIRD AMENDED CLASS ACTION COMPLAINT

1  fees…lose not only money spent on higher fees, but also lost investment opportunity;
2  that is, the money that the portion of their investment spent on unnecessary fees would
3  have earned over time." *Tibble*, 843 F.3d at 1198 ("It is beyond dispute that the higher
4  the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

5      7.    The Supreme Court recently reiterated that interpreting "ERISA's duty of
6  prudence in light of the common law of trusts" a fiduciary "has a continuing duty of
7  some kind to monitor investments and remove imprudent ones" and a plaintiff may
8  allege that a fiduciary breached the duty of prudence by failing to properly monitor
9  investments and remove imprudent ones. *Hughes v. Northwestern Univ.*, 142 S.Ct.
10  737, 741 (2022).

11     8.    The Plan had over $746 million dollars in assets under management in
12  2017 and by the end of 2020 the Plan had grown to over $930 million in assets that
13  were/are entrusted to the care of the Plan's fiduciaries. The Plan's assets under
14  management qualifies it as a jumbo plan in the defined contribution plan marketplace,
15  and among the largest plans in the United States.   In 2017, only 0.1 percent (623 of
16  569,257) of 401(k) plans in the country had between $500 million and $1 billion in
17  assets under management.[6] This figure remained constant to the end of 2019, by 2019
18  only 0.1 percent (726 of 603,217) of 401(k) plans in the country had between $500
19  million and $1 billion in assets under management.[7] As a jumbo plan, the Plan had
20  substantial bargaining power regarding the fees and expenses that were charged against
21  participants' investments.   Defendants, however, did not try to reduce the Plan's
22  expenses or exercise appropriate judgment to scrutinize each investment option that
23  was offered in the Plan to ensure it was prudent.

24
25
---
26  [6] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2017
    at Ex. 1.2, p. 13., available at
27  https://www.ici.org/system/files/attachments/20_ppr_dcplan_profile_401k.pdf.
28  [7] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2019
    at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2022-09/22-ppr-dcplan-profile-
    401k.pdf

SECOND THIRD AMENDED CLASS ACTION COMPLAINT

9.    Plaintiffs allege that during the putative Class Period (July 28, 2017 through the date of judgment) Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost;  and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories.

10.    Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

11.    Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## IV.    JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

13.    This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

14.    Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District

1    and a substantial part of the events or omissions giving rise to the claims asserted herein

2    occurred within this District.

### V.    PARTIES

**Plaintiffs**

5    15.    Plaintiff, Michael Phillips ("Phillips"), resides in Lansdale, Pennsylvania.

6    During his employment, Plaintiff Phillips participated and invested in the options

7    offered by the Plan that are challenged in this lawsuit. Plaintiff Phillips specifically

8    invested in the American Century target date series described herein. He suffered injury

9    to his Plan account from the underperformance and excessive expense of these funds.

10   In addition, Plaintiff Phillips suffered injury to his Plan account by having to pay for

11   her share of consulting fees to maintain any of the lower performing or expensive funds

12   in the Plan whether specifically identified herein or not, as described below. Further,

13   Plaintiff Phillips suffered injury to his Plan account by the fact that his claim against

14   his share of investments in the Plan is diminished by the underperforming and

15   expensive funds which were left languishing in the Plan whether they are specifically

16   identified herein or not. Under IRS regulations, a participant in any retirement plan

17   regulated by ERISA, always maintains a claim in the form of an undivided interest

18   against a plan's trust for his or her share of the investment. *See*, 26 CFR § 1.414(I)-1.

19   The amount of this undivided interest is diminished for all participants when a plan is

20   paying excessive fees and maintains expensive and/or underperforming funds, as

21   alleged below. *Id*.

22   16.    Plaintiff, Brenda Paclik ("Paclik"), resides in Fort Worth, Texas. During

23   her employment, Plaintiff Paclik participated and invested in the options offered by the

24   Plan that are challenged in this lawsuit. She suffered injury to her Plan account from

25   the underperformance and excessive expense of these funds. Plaintiff Paclik

26   specifically invested in the American Century target date series described herein. In

27   addition, Plaintiff Paclik suffered injury to her Plan account by having to pay for her

28   share of consulting fees to maintain any of the lower performing or expensive funds in

the Plan whether specifically identified herein or not, as described below. ~~Further,~~
~~Plaintiff Paclik suffered injury to her Plan account by the fact that her claim against her~~
~~share of investments in the Plan is diminished by the underperforming and expensive~~
~~funds which were left languishing in the Plan whether they are specifically identified~~
~~herein or not. Under IRS regulations, a participant in any retirement plan regulated by~~
~~ERISA, always maintains a claim in the form of an undivided interest against a plan's~~
~~trust for his or her share of the investment. *See*, 26 CFR § 1.414(I)-1. The amount of~~
~~this undivided interest is diminished for all participants when a plan is paying excessive~~
~~fees and maintains expensive and/or underperforming funds, as alleged below. *Id.*~~

17.    Plaintiff, Crystal Franklin ("Franklin"), resides in Acton, Massachusetts. During her employment, Plaintiff Franklin participated and invested in the options offered by the Plan that are challenged in this lawsuit. She suffered injury to her Plan account from the underperformance and excessive expense of these funds. Plaintiff Franklin specifically invested in the American Century target date series described herein. In addition, Plaintiff Franklin suffered injury to her Plan account by having to pay for her share of consulting fees to maintain any of the lower performing or expensive funds in the Plan whether specifically identified herein or not, as described below. ~~Further, Plaintiff Franklin suffered injury to her Plan account by the fact that~~
~~her claim against her share of investments in the Plan is diminished by the~~
~~underperforming and expensive funds which were left languishing in the Plan whether~~
~~they are specifically identified herein or not. Under IRS regulations, a participant in~~
~~any retirement plan regulated by ERISA, always maintains a claim in the form of an~~
~~undivided interest against a plan's trust for his or her share of the investment. *See*, 26~~
~~CFR § 1.414(I)-1. The amount of this undivided interest is diminished for all~~
~~participants when a plan is paying excessive fees and maintains expensive and/or~~
~~underperforming funds, as alleged below. *Id.*~~

__18.__    Plaintiffs have standing to bring this action on behalf of the Plan because they participated and invested in the Plan and were injured by Defendants' unlawful

1  conduct. ~~Further, Plaintiffs have standing because their claims against their share of~~
2  ~~investments in the Plan is diminished by the underperforming funds suffered by the~~
3  ~~Plan whether they are specifically identified herein or not, as discussed above.~~

4  ~~18.~~19. Plaintiffs are entitled to receive benefits in the amount of the difference

5  between the value of their accounts currently, or as of the time their accounts were

6  distributed, and what their accounts are or would have been worth, but for Defendants'

7  breaches of fiduciary duty as described herein.

8  ~~19.~~20. Plaintiffs did not have knowledge of all material facts (including, among

9  other things, what a competitive expense ratio is for funds in a retirement plan and how

10  target date funds and other funds in a retirement plan should perform as compared to

11  their peers and benchmarks) necessary to understand that Defendants breached their

12  fiduciary duties and engaged in other unlawful conduct in violation of ERISA until

13  shortly before this suit was filed.

14  **Defendants**

15  **Company Defendant**

16  ~~20.~~21.   Cobham is a named fiduciary and the Plan Sponsor for the Plan with a

17  principal place of business ~~being~~at 5300 Hellyer Avenue, San Jose, California. The

18  2020 Form 5500 for the Cobham United States 401(k) Plan ("2020 5500") at 1.[8]

19  According to its website, Cobham is a government contractor specializing in

20  microwave and millimeter wave technologies for the aerospace and defense industries.[9]

21  Cobham employs over 2,000 individuals in nine states throughout North America. *Id*

22  ~~21.~~22. Cobham appointed the Committee to, among other things, ensure that the

23  investments available to the Plan's participants are appropriate, had no more expense

24  than reasonable and performed well as compared to their peers. Cobham Advanced

25  ――――――――――――――――

26  [8] As discussed above, the defined term Cobham or Company refers to Cobham Management Services,

27  Inc. who was the Plan Sponsor prior to November 5, 2020, Cobham Advanced Electronic Solutions, Inc. who was the Plan Sponsor between November 5, 2020 and December 31, 2022 and/or it may

28  also refer to CAES Systems, LLC who was the Plan Sponsor subsequent to January 1, 2023.
[9] https://caes.com/about last accessed on June 21, 2023.

1  Electronic Solution Inc., 401(k) Plan Committee Charter, dated October 23, 2020

2  ("Charter") at 1-2. As will be discussed below, the Committee fell well short of these

3  fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the

4  concomitant fiduciary duty to monitor and supervise their appointees.

5      ~~22.~~23. Accordingly, Cobham during the putative Class Period is/was a fiduciary

6  of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A)

7  because it had a duty to monitor the actions of the Committee.

8      ~~23.    For the foregoing reasons, the Company is a fiduciary of the Plan, within~~

9  ~~the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).~~

10  **Board Defendants**

11      24.    Cobham, acting through its Board[10], appointed the Committee ~~to, among~~

12  ~~other things, ensure that.~~ Accordingly, like the ~~investments available to~~Company, the

13  ~~Plan's participants are appropriate,~~Board had ~~no more expense than reasonable and~~

14  ~~performed well as compared to their peers. Charter at 3-6. Under ERISA, fiduciaries~~

15  ~~with the power to appoint have the~~a concomitant fiduciary duty to monitor and

16  supervise ~~their appointees~~the Committee.

17      25.    ~~Accordingly, each~~Each member of the Board during the putative Class

18  Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the

19  meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty

20  to monitor the actions of the Committee.

21      26.    The Board and the unnamed members of the Board during the Class

22  Period (referred to herein as John Does 1-10), are collectively referred to herein as the

23  "Board Defendants."

24  **Committee Defendants**

25

26  _____

    [10] As discussed above, for periods prior to January 1, 2023, the defined term Board shall refer to the

27  Board of Directors of Cobham Advanced Electronic Solutions, Inc. and for periods subsequent to
    January 1, 2023, the defined term Board shall refer to the Board of Directors of CAES Systems, LLC

28  or a related entity having a board of directors that acts in that capacity or a similar capacity for CAES
    Systems, LLC.

27.    As discussed above, Cobham appointed the Committee[11] to, among other things, ensure that the investments available to the ~~Plans'~~ Plan's participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. Charter at 3-6.

28.    ~~The Charter goes on to further define the Committee's role in selecting and monitoring the investment choices available in the Plan as follows:~~According to the Charter, "[t]he Committee shall … review and monitor the investment performance of the Plan …" Charter at 2.

29.    The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of the Plans' assets.

30.    The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**Additional John Doe Defendants**

31.    To the extent that there are additional officers, employees and/or contractors of Cobham who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager or consultant for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Cobham officers, employees and/or contractors who are/were fiduciaries of

---

[11] For periods prior to January 1, 2023, the defined term Committee shall refer to the 401(k) Plan Committee of Cobham Advanced Electronic Solutions, Inc. and for periods subsequent to January 1, 2023, the defined term Committee shall refer to the 401(k) Plan Committee of CAES Systems, LLC or similar entity exercising control over Plan assets.

the Plans within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## VI.  CLASS ACTION ALLEGATIONS[12]

32.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[13]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plans, at any time between July 28, 2017 through the date of judgment (the "Class Period").

33.    The members of the Class are so numerous that joinder of all members is impractical.  The 2020 Form 5500 lists 5,713 Plan "participants with account balances as of the end of the plan year."  2020 Form 5500 at 2.

34.    Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the ~~Plans~~Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

---

[12] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plan and all participants.  *See, e.g.*, *In re: Wilmington Trust Corp.*, 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims).  ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[13] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

~~SECOND~~THIRD AMENDED CLASS ACTION COMPLAINT

35.    There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A.    Whether Defendants are/were fiduciaries of the Plan;

B.    Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

C.    Whether the Company and Partnership Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.    The proper form of equitable and injunctive relief; and

E.    The proper measure of monetary relief.

36.    Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

37.    This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

38.    In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the

Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VII.  THE PLAN

39.    The Plan is a defined contribution plan covering substantially all eligible employees of Cobham. 2020 Auditor Report for the Cobham United States 401(k) Plan ("2020 Auditor Report") at 3. More specifically, the Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. *Id.* Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.  *Id.*

### *Eligibility*

40.    In general, the Plan covers substantially all employees of Cobham from the first day of employment. *Id.*

### *Contributions*

41.    There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, discretionary profit-sharing contributions and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions. *Id.*

42.    With regard to employee contributions, participants can elect to make annual pre-tax and Roth contributions subject to Internal Revenue Service ('IRS') limitations. *Id*. With regard to pre-tax contributions made by the employer, Cobham matches half of the contribution made by each employee up to 2% of total compensation. *Id.*

43.   Like other companies that sponsor a 401(k) plan for their employees, Cobham enjoys both direct and indirect benefits by providing matching contributions to the Plan's participants.  Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

44.   Cobham's employees benefit in other ways from the Plan's matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

45.   Given the size of the Plan, Cobham likely enjoyed a significant tax and cost savings from offering a match.

### *Vesting*

46.   Participants are automatically vested in any contributions they made to their accounts themselves. 2020 Auditor Report at 4. However, matching contributions made by Cobham, as of January 1, 2019, are considered immediately vested. *Id.* Contributions made by Cobham after January 1, 2019 were subject to a three year vesting schedule. *Id.*

### *The ~~Plans'~~Plan's Investments*

47.   In theory, the Committee determines the appropriateness of the Plan's investment offerings and monitors investment performance ~~at least yearly.~~. Charter at 2.(ii). As will be discussed in more detail below, the Committee fell well short of these fiduciary goals.

48.   Several funds were available to the Plan's participants for investment each year during the putative Class Period.  Specifically, a participant may direct all contributions to selected investments as made available and determined by the Committee.

49.    At the Plan's fiscal year end in 2020, the Plan had over $930 million in assets under management that were/are entrusted to the care of the Plan's fiduciaries. 2020 Auditor Report at 2.

***Payment of the Plan's Expenses***

50.    During the Class Period, administrative expenses were paid by using Plan assets. 2020 Auditor Report at 6.

**VIII.** ~~THE PLAN'S FEES AND INVESTMENT PERFORMANCE DURING THE CLASS PERIOD WERE UNREASONABLE~~

~~A.~~    **The Totality of the Circumstances Demonstrates that the Plan's Fiduciaries Failed to Administer the Plan in a Prudent Manner**

**A. Overview**

**1.    ERISA Fiduciaries Are Held to the Highest Standards Regarding Process and Methodology for Evaluating Investments**

51.    As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

52.    ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exist "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S.Ct. at 741.

53.    Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plan's investments because this information is solely within the possession of Defendants prior to discovery.  *See, Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585,

598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

54.    In fact, in an attempt to discover the details of the Plan's mismanagement, Plaintiffs wrote to the ~~Defendants~~Plan administrator to request, among other things, "all written instruments" governing or pertaining to the Plan, including "investment policy statements and investment management contracts, or other instruments under which the Plan was established or operated, and all amendments, exhibits, or appendices thereto," as well as the Committee's meeting minutes.  This request was made on April 28, 2022. *See* Exhibit A.

~~54.~~55. By letter dated May 26, 2022, Cobham ~~failed to provide~~responded providing: the Plan's 2020 Form 5500; the 2019 Summary Plan Description (2019 SPD); the Plan adoption agreement and amendment, an IRS opinion letter, a trust amendment, and the 401(k) Plan Committee Charter.  *See* Exhibit F.  No investment policy statement, to the extent it exists, or meeting minutes, to the extent they exist, were produced in response to Plaintiffs' request.

~~55.~~56. Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process.  But in most cases, even that is not sufficient.  For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence.  Deliberative processes can vary in quality or can be followed in bad faith.  In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

56.57. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes and methods based upon several factors as described below.

57.58. As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services…" DOL 408(b)(2) Regulation Fact Sheet.

58.59. "The duty to pay only reasonable fees for plan services and "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[14]

59.    Here, Defendants did not engage in a prudent process in evaluating investment management fees and the prudence of the Plan's funds.

60.    (A)   Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

61.    A prudent investment professional, and hence a fiduciary, must regularly evaluate a fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the

---

[14] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false. Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain.

**Formatted:** Font: Not Bold, Not All caps

investment, total assets under management within the fund, fees, and other relevant factors.

62.    With respect to investment returns, diligent investment professionals monitor the performance of their selected investments using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

63.    The measurement of investments against prudently managed alternatives is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

64.    The specific methodologies used to select prudent investments are primarily data driven.  Such data is provided by investment research companies like Morningstar, which is the most accepted source of investment performance information, as it has the most robust information on mutual funds, CITs, and other types of investments.  Indeed, Morningstar is used and trusted by virtually all financial professionals and fiduciaries, including the Plan's fiduciaries who agree Morningstar's data is reliable.

65.    The Cobham United States 401(k) Plan, Important Plan and Investment-Related Information, dated May 9, 2022 ("2022 Disclosure") (Exhibit B) acknowledges that the Plan's Target Date "returns are provided by Morningstar…." *Id.* at A4. It further states, "[g]enerally, data on Fidelity mutual funds is provided by FMR LLC, data on non-Fidelity mutual funds [like the Target Date series] is provided by Morningstar, LLC, and data on non-mutual fund products is provided by Morningstar, LLC, the product's investment manager or trustee, the plan sponsor whose plan is offering the product to participants, or other third party. Although Fidelity believes data gathered from these third-party sources is ***reliable***, it does not review such information and cannot warrant it to be accurate, complete, or timely." 2022 Disclosure at B19 (emphasis added).  Fidelity Investments is the Plan's recordkeeper.  2019 SPD at 3.

66.     Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

67.     It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S.Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.")

68.     Lastly, to the extent plan fiduciaries have adopted an investment policy statement, which does not appear to be the case here, those fiduciaries "must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Lauderdale v. NFP Retirement, Inc.*, 2022 WL 17260510, at * 10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

69.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the selection (and maintenance) of several funds in the Plan throughout the Class Period, including the Target Date Series identified below, that wasted the assets of the Plan and the assets of participants because of unnecessary costs and underperformance.

**B. Defendants Breached Their Fiduciary Duties by Selecting and Retaining in the Plan's Lineup the Chronically Underperforming American Century Series of Target Date Funds**

**1.2.     The Use of Target Date Funds in 401(k) Plans**

70.     At all relevant times, Defendants ~~caused~~maintained the ~~Plan~~authority to ~~include~~exercise control over the Plan's investments, including the Plan's American Century Target Date Funds.

71.    Defendants included in its the Plan's menu of investment offerings the materially underperforming American Century target date suite whether it was the mutual fund version or the collective investment trust version.  Both had a nearly identical asset portfolio and managers with the primary difference being expense (hereinafter the entire series will be referred to as the "American Century Target Date Series[15]," when referred to collectively).

72.    During the Class Period, the Plan offered the collective investment trust ("CIT") version of the American Century Target Date Series known as the American Century Retirement Date Trust series. Since the first CIT version of this series wasn't available until August of 2014 and not included in the Plan until 2016, the mutual fund version will be used here for comparison purposes since its mutual fund counterpart, namely, the American Century One Choice Date series first began in May of 2008 which will provide more of a historical timeline of the series performance. The R6 version was in the Plan as early as 2015, it had an inception date of July 2013 while the next lowest share class, the I shares, came on the market in May of 2008 and will be used here.  The I share is an accurate comparator to the rest of the series since it had identical managers and holdings to both the R6 and the CIT versions with nearly identical performance histories on a total return basis with fees excluded but this combined with the Beta analysis, below, makes the comparisons efficient with regards to which fund costs more or less.

---

[15] During the Class Period, the Plan offered the collective investment trust ("CIT") version of the American Century Target Date Series known as the American Century Retirement Date Trust series. Since the first CIT version of this series wasn't available until August of 2014 and not included in the Plan until 2016, in fairness, the mutual fund version will be used here for comparison purposes since its mutual fund counterpart, namely, the American Century Once One Choice Date series first began in May of 2008 which will provide more of a historical timeline of the series performance. The R6 version was in the Plan as early as 2015, it had an inception date of July 2013 while the next lowest share class, the I shares, came on the market in May of 2008 and will be used here.  The I share is an accurate comparator to the rest of the series since it had identical managers and holdings to both the R6 and the CIT versions with nearly identical performance histories on a total return basis with fees excluded but this combined with the Beta analysis, below, makes the comparisons efficient with regards to which fund costs more or less.

1    73.    Indeed, using prior share classes of an investment to measure performance

2    is standard practice.  The fee disclosure for the Target Date Series provided to Plan

3    participants states: "The analysis on these pages may be based, in part, on adjusted

4    historical returns for periods prior to the [share] class's actual inception of 03/23/2018.

5    The returns are provided by Morningstar and reflect the historical performance of the

6    oldest, eligible share class of the Pool with reported expenses and an inception date of

7    08/15/2014." 2022 Disclosure at A4.

8    60.74.  The performance histories of these funds were mediocre and their risk

9    return profiles were flat when compared to their appropriate peer groups.

10    61.75.  Target date funds are designed to provide a single diversified investment

11    vehicle for plan participants.  "Target date fundsinvestments are offered as a suite of

12    funds, withgenerally designed for investors expecting to retire around the year

13    indicated in each  fund based on the participant's anticipated retirement

14    dateinvestment's name."  2022 Disclosure at A4.

15    62.76.  The first target date funds in the industry were offered as early as 1994,

16    and since then the market for target date funds has exploded with numerous investment

17    managers offering a variety of different target date fund investments.

18    63.77.  By the mid-2000s, many target date funds with established performance

19    histories were available to defined contribution plans. By 2009, several target date

20    funds had performance histories of five years or more.

21    64.78.  Multiple types of assets are included in a target date fund portfolio,

22    including equity (stock) and fixed income (bond) securities. Target date funds offer

23    diversity and balanced exposure to a broad array of underlying securities included in

24    the fund.

25    65.79.  An investment in a single target date fund can be attractive to plan

26    participants who do not want to actively manage their retirement savings and

27    periodically convert to more conservative holdings as their retirement date draws near.

28    Target date funds automatically rebalance their portfolios"are managed to gradually

become more conservative over time.  The investment risks of each target date investment change over time as the participant gets closer to retirementits asset allocation changes." 2022 Disclosure at A4.

66.80.  This rebalancing occurs based on the fund's "glide path." A glide path determines how the fund's target asset allocations across the underlying securities are expected to change over time and how they become more conservative as the target retirement date approaches.

67.81.  TheAs mentioned above, the target date refers to the participant's expected retirement year. For example, "target date 2030" funds are designed for individuals who intend to retire in 2030. As the year 2030 approaches, the fund's investment manager adjusts the underlying asset mix to become more conservative.

68.82.  Target date funds have been divided into two broad categories by some industry professionals based on the fund's glide path: "To" and "Through" target date funds. A "To" target date fund is designed to allocate its underlying assets to the most conservative investments at the year of the expected retirement. In contrast, a "Through" target date fund continues its glidepath progression to reach its most conservative asset allocation past the expected retirement date. This method focuses on the life expectancy of the participant rather than the retirement date.

69.83.  However, for purposes of this Complaint, it matters little whether a target date fund is a through or a to fund since the earliest retirement target year will be excluded from this analysis, currently the 2025 year. Doing this allows all target date funds to be compared equally since only the performance and risk return characteristics in the early to middle of the target date path are considered for analysis. In fact, Morningstar, the most respected independent research database in the financial industry doesn't distinguish between a so called to or through fund as is indicated by the lack of a separate Morningstar category and index for to and through target date funds. Instead, all target date funds are expected to track the appropriate Morningstar indexes and benchmarks.

1    70.    The development of a target date fund's glide path and the corresponding
2    asset allocations are important components of a target date fund. Constructing and
3    maintaining a proper glide path and prudent asset allocation for target date funds is
4    complex, time consuming, and requires input from actuaries and other qualified
5    investment professionals.

6    71.    For all target date funds, diversions from a determined glide path or
7    significant changes in the underlying assets or asset allocations can have an extremely
8    negative impact on wealth aggregation for investors. This impact can be particularly
9    profound for participants in a 401(k) plan.

10    72.    It is well known in the investment industry that 401(k) participants rarely
11    make trades in their 401(k) accounts. A fiduciary, held to the standard of an investment
12    professional, therefore must ensure that an investment option added to a 401(k) plan's
13    suite of investments remains prudent and in the best interest of plan participants.

14    73.84.  A fiduciary's duty to ensure that a prudent target date fund is offered to
15    plan participants is heightened when considering the circumstances in which these
16    funds are used by participants. Given the structure of target date funds, participants
17    often invest all their retirement assets in a single target date fund that matches their
18    retirement date. Some plans, like the Plan, make target date funds the default selection
19    if plan participants do not select a specific fund within the 401(k) plan's lineup of
20    investments. The use of a plan's target date funds as the default investment option
21    underscores the importance of a prudent and diligent process of monitoring target date
22    funds by plan fiduciaries.

23    74.85.  A fiduciary must monitor all investment options in a 401(k) plan as a
24    prudent investment professional. This process includes a requirement for the fiduciary
25    to regularly evaluate the fund's performance history, the portfolio manager's
26    experience and tenure, changes to the fund's investment strategy, changes to the
27    underlying assets in the investment, total assets under management within the fund,
28    fees, and any other relevant factors.

1    75.86. With respect to investment returns, diligent investment professionals

2  monitor the performance of their selected target date funds using appropriate industry-

3  recognized "benchmarks" and prudently managed equivalents.

4    76.87. The measurement of target date funds against prudently managed

5  alternatives is critical given that these alternatives represent other target date funds

6  available to the plan, which may be a more appropriate choice to meet participants'

7  retirement needs.

8    77.   Given the construction and composition of target date funds, diligent

9  investment professionals must perform ongoing analyses and monitoring to ensure that

10  the selected target date funds remains prudent options after their initial selection and

11  insertion into the plan's suite of choices.

12    78.   During periods of underperformance, diligent investment professionals

13  closely analyze the causes of the underperformance through attribution analyses.

14  Causes or contributing factors are identified and analyzed.

15    79.   By 2010, multiple investment firms and banks offered target date funds

16  with established and consistent performance histories, stable and experienced

17  management, and discrete changes to the underlying assets and allocations.

18    80.88. Established target date fund investment managers include, but are not

19  limited to, American Funds and T.Rowe Price. American Funds and T.Rowe have each

20  offered target date funds for nearly 20 years and those target date funds have provided

21  stable investment returns to 401(k) plan participants.

22        **(2)   The American Century Series of Target Date Funds**

23               **Chronically Underperformed**

24    81.   At all relevant times, Defendants maintained the authority to exercise

25  control over the Plan's investments, including the Plan's target date fund investment

26  options.

27    82.   At all relevant times during the Class Period, the Plan maintained the

28  American Century Target Date Series.

83.89.  In 2020, the 401(k) Plan held approximately $155 million dollars in the American Century Target Date Series. 2020 401(k) Plan Auditor Report at 10. With such a large amount invested in the target date series, the Plan would have been able to choose virtually any available target date series for the Plan.

84.90.  The American Century Target Date Series are the only target date investing options in the Plan. In other words, participants in the Plan who want to invest in a target date strategy have no choice other than the American Century Target Date Series.

85.91. Defendants were under an obligation under ERISA to carefully vet the American Century Target Date Series before selecting them for inclusion in the Plan. Defendants were also under a continuing obligation under ERISA to carefully monitor and scrutinize the performance of the American Century Target Date Series on an ongoing basis thereafter.

     (a)    **The American Century Target Date Series Materially Underperformed Relative to Comparator Target Date Funds and Indexes**

86.92. The American Century Target Date Series consistently materially underperformed industry-accepted benchmarks for target date funds used by investment professionals as well as the benchmarks in the Series' disclosures.

87.93.  The American Century Target Date Series can be compared to various similar target date funds ("Comparator Funds") and relevant indexes ("Comparator Indexes") as benchmarks. Suitable Comparator funds include the T.Rowe Price Retirement target date suite and the American Funds target date suite. These two target date suites are suitable Comparator Funds to the American Century Target Date Series because Morningstar, the most well respected and accepted financial industry fund database places all three funds in the US Fund Target-Date Category and/or the US SA Target Date Category ("Target Date Category") and compares those funds to how an average fund in that category should perform by using the Morningstar Lifetime

1  Moderate Index.[16] There are, at least, 200 other similar funds in the Target Date

2  Category, as will be described in more detail below.

3      94.    As noted above, the Plan's fiduciaries have acknowledged the reliability

4  of Morningstar as a resource.

5      88.95.A Morningstar Category is assigned by placing funds [*e.g.*, the T.Rowe

6  Price Retirement target date suite and the American Funds target date suite etc.] into

7  peer groups based on their underlying holdings. The underlying securities in each

8  portfolio are the primary factor in [Morningstar's] analysis . . . . Funds are placed in a

9  category based on their portfolio statistics and compositions over the past three years.

10 Analysis of performance and other indicative facts are also considered." *See*

11 Morningstar's summary of the Northern Trust Focus 2045 Fund, filed in *Allegretti v.*

12 *Walgreen Co. et al.*, No. 19-cv-05392 at Dkt. 43 ECF pg. 28 (N.D. Ill. Dec. 6, 2019).

13 The analysis in *Allegretti* similarly deals with the Morningstar Lifetime Moderate

14 Index category. *Id.*

15     89.96. Further, Morningstar itself states that it created its categories "to help

16 investors make meaningful comparisons between mutual funds. Morningstar found that

17 the investment objective listed on a fund's prospectus often did not adequately explain

18 how the fund was actually invested." Morningstar Category Classification, 31 March

19 2022 ("Morningstar Classifier")[17] at page 5. The Morningstar Classifier goes on to state

20 that "[f]or example, many funds claimed to be seeking "growth," but some of those

21

22 _____

23 [16] Although, during the Class Period, the share class of the American Century Target Date Series
24 was in the Collective Investment Trust ("CIT") version, the identical mutual fund version will be
   analyzed here because it had been in existence longer than the CIT version. Accordingly, the mutual
25 fund versions of the two Comparator funds will also be used. The mutual fund versions of each fund
   are accurate comparators to the CIT version because they have identical managers and performed in
26 a nearly identical fashion to their mutual fund counterparts. In addition, the mutual fund versions of
   each fund have been in existence for a longer of period of time allowing the performance and risk
27 characteristic of each to be analyzed over a longer period of time.
   [17] Available at the following web address:
28 https://advisor.morningstar.com/Enterprise/VTC/MorningstarCategoryClassificationforFunds_April
   2022.pdf. Last accessed on May 12, 2023.

1  were investing in established blue-chip companies while others were investing in
2  small-cap companies." *Id.*

3      97.    Morningstar is the most well respected independent research tool
4  available to the financial industry and is used and trusted by virtually all financial
5  professionals and fiduciaries. as evidenced by the Plan fiduciaries' own reliance on
6  Morningstar data.

7      90.98.  Morningstar places the two Comparator Funds and the American Century
8  Target Date Series in the Target Date Category because the underlying holdings of each
9  fund match the risk return profile of this category. The Target Date Category should
10  concentrate its holdings in the large blend/risk return category. In fact, as demonstrated
11  by the graphs in Appendix "A"Exhibit "C" which make up a part of the Morningstar
12  report for each fund, these three funds do in fact share these qualities. It's for this reason
13  that the two Comparator Funds are accurate and suitable comparators along with the
14  more than 200 funds that Morningstar has placed in the Target Date Category.[18]

15      91.99.  A prudent fiduciary should have used some or all of these benchmarks, or
16  substantially similar benchmarks, to evaluate the performance of the American Century
17  Target Date Series as early as the inception of the Class Period, or sooner, and on an
18  ongoing basis, thereafter.

19      92.100.   The performance of the American Century Target Date Series
20  lagged behind the performance of the applicable Comparator Funds for many years
21  before the inception of the Class Period clearly showing that it was an imprudent choice
22  for the Plan.

---

[18] Each year, as funds are created or discontinued, the number of funds in this category varied but generally averaged slightly more than 200 funds for both the US Fund Target-Date Category and the US SA Target Date Category. The list of funds in this Morningstar category in any given year, would include various share classes of each target date suite. In addition, the 200 funds referenced is conservative as the US Fund Target-Date Category and the US SA Target Date Category each averaged approximately 200 funds each year in their respective categories and both are meant to track the same index, namely the Lifetime Moderate Index.

93.101.    The yearly performance as early as 2014, well before the inception of the Class Period, shows that the American Century Target Date Series were, historically, an imprudent selection. Using target date 2040 as a sample target date year,[19] it's clear that out of more than 200 Morningstar peer funds in the LT Mod target date group, the American Century Target Date Series was mediocre, at best. Here, two target date series from this Morningstar peer group will be analyzed, namely T.Rowe Price Retirement 2040 (TRRDX) and the American Funds 2040 Target Retirement R6 (RFGTX) ("collectively the "Two Comparator Funds") as against the sample year for the American Century Target Date Series, namely the American Century Once Choice 2040 I (ARDSX).

94.102.    As can be seen in the graph below, which compares the performance of the Two Comparator Funds and their performance against the appropriate Morningstar Index, the Morningstar Lifetime Moderate Index, MSAAM40M, ("Morningstar Index"), it's clear the American Century Target Date Series performed poorly as compared to its peers and generally below its Morningstar Index. The Two Comparator Funds performed well above the Morningstar Index for many years before the Class Period while the American Century Target Date Series performed generally below it. In fact, in the years leading up to the Class Period, the American Century Target Date Series performed well below the Morningstar Index for several consecutive quarters and clearly should have been removed at that time or never have been included in the Plan. This obligation to select appropriate funds for the Plan and/or to monitor the funds selected, which is a clear obligation of the Plan Fiduciaries under ERISA, is continuing and continued to be an appropriate reason for removal of the American Century Target Date Series up to the start of the Class

---

[19] A complete analysis for each target date year beginning in 2030 to 2055 is attached hereto as Appendix "B"Exhibit "D." As discussed above, 2025 is removed from this analysis to make a fair comparison between funds using their early to mid target date life. All target date years from 2030 to 2055, currently, should have greater focus on growth for retirement savings, especially the 2040 year which will be used as the primary comparator.

Period. And, again, as discussed above, there were more than 100 better choices between the Index and the Comparator Funds that could have been selected for the Plan.[20] The graph below uses a historical 3-year average[21] as is required by industry professionals and trust law on which ERISA is based. *Hughes v. Northwestern Univ.*, 142 S.Ct. 737, 741 (2022).   This three year average is  based on total return meaning that the fees paid for the fund's maintenance and management are not factored into their performance. However, when taking into account total returns and the Beta analysis, below, the comparator funds were the most cost-effective.



---

[20] In this case, both possible Morningstar Categories, namely the US Fund Target Date 2040 Category and the US SA Target Date 2040 Category tracked the appropriate index closely making this fund ranking analysis generally accurate for each year analyzed.

[21] A 3-year average is used for purposes of this analysis because it's the best early indicator of issues with any particular fund, however, 5-year averages provide similar results. The Plan fiduciaries should have used 3-year averages in selecting and maintaining the American Century Target Date Series throughout the Class Period. These 3-year averages would or should have been available to them, as Plan fiduciaries, at the time they reached their decisions on selection and maintenance of this Series and cannot be said to constitute a hindsight analysis.

95.103.     As demonstrated in the graph above, beginning in the third quarter of 2013, the American Century Target Date 2040 Series began to significantly underperform the Morningstar Index for, at least, three consecutive quarters. Industry standards and ERISA require that after a fund show signs of degradation to this extent, such a fund should be placed on a watchlist and replaced with one of the 100 funds that would have performed better in the Target Date Category as early as the next quarter of underperformance. *Hughes at* 741 (reiterating that ERISA is based on trust law); *see also*, the Charter of the Cobham Advance Electronics Solutions, Inc. 401(k) Plan Committee Charter as amended and restated as of October 23, 2020 at 2 (providing that the Committee must "review and monitor the investment performance of the Plan… .") In addition, as soon as the fund showed significant underperformance issues, the Plan's fiduciaries should have noticed that many funds in the Target Date Category were performing well above their Morningstar Index. Had they done so, as they were obligated to do under ERISA, they would have inquired why the American Century Target Date Series lagged behind the Morningstar Index and they would have learned that the better performing funds in the Target Date Category employed a superior investment strategy. This would have caused them to either never have selected this Series for inclusion in the Plan or to have removed it before the Class Period by no later than the start of the Class Period.

96.104.     To make matters worse, the American Century Once Choice 2040 I (ARDSX) ranked poorly as compared to its peers in its Morningstar Category. For example, in 2016, prior to the Class period, this fund ranked in the 71th percentile out of 221, or 156th out of 221, funds in the Lifetime Mod 2040 TR category maintained by Morningstar. In 2017, it ranked in the 95th percentile being ranked only higher than 12 of a possible 234 funds in that category in that year. Pointing out some of its worst years, in 2019 it ranked in the 85th percentile, in 2021 it ranked in the 96th percentile and, thus far into 2023, it's ranking in the 91st percentile. It did have some years where it ranked higher but this is only evidence of the instability of the funds especially where

it clearly ranked poorly more times than it had ranked higher. Similar results are seen for the remaining target date years that are part of the American Century Target Date Series.

97.105.    This trend of underperformance continued into 2015, although the fund rose slightly above its Morningstar Index in 2016, by the middle of 2017 the fund again showed significant signs of a flawed investment strategy, which was or should have been apparent to the Plan fiduciaries in 2013 through 2015, but this underperformance again became painstakingly evident from the middle of 2017 forward as the fund significantly underperformed its Morningstar Index for ten consecutive quarters. Yet, the Plan fiduciaries again neglected to take action while millions of dollars of retirement savings of the Plans' participants evaporated. These underperformance issues are demonstrated in the graph below:



98.106.    There's no justifiable excuse for having allowed the American

1   Century Target Date Series to languish in the Plan for so long without taking any action

2   at all. This issue has nothing to do with any differences in the purpose of the Series or

3   any possible justifiable difference in investment strategy, it's simply evidence of a

4   clearly flawed investment strategy. Investment professionals and fiduciaries charged

5   with putting the interests of plan participants first use what's know as Modern Portfolio

6   Theory or MPT to prove that an investment strategy had been historically flawed for a

7   particular fund.

8       99.107.      Using MPT, fiduciaries quantify a funds investment strategy on an

9   absolute and relative volatility basis. MPT allows fiduciaries to gauge the amount of

10  risk necessary for a fund to meet or exceed the appropriate index. Standards at any

11  given time are set by the all the funds in a Morningstar Category and those funds

12  performing below the index and category need to consider the strategies utilized by the

13  better performers and make adjustments as necessary. By 2014, the Plan fiduciaries

14  should have had a discussion with the managers of the American Century Target Date

15  Series to learn why this Series had such significant issues. Clearly, had this discussion

16  taken place prior to the inclusion of the Series in the Plan it would not have been

17  included in the Plan. The Plan fiduciaries failure in understanding the Series issues,

18  allowed the Series to continue to underperform in the Plan until at least 2022. The

19  Restatement of Trusts describes the duty to use MPT or similar strategy as follows:

20  "[t]his standard requires the exercise of reasonable care, skill, and caution, and is to be

21  applied to investments not in isolation but in the context of the trust portfolio and as a

22  part of an overall investment strategy, which should incorporate risk and return

23  objectives reasonably suitable to the trust". UPIA § 2(b) (Unif. Law Comm'n

24  1995); Restatement (Third) of Trusts § 90(a) (2007) (*See Birse v. CenturyLink, Inc.*,

25  2019 WL 9467530, * 5 (D. Col. Oct. 23, 2019).

26      100.108.      There are many MPT factors, but, one of the most important factors,

27  is simply known as Beta. Morningstar defines Beta as "the measure of systemic risk

28  with respect to the risk-free rate. Systemic risk is the tendency of the value of the fund

- 32 -

and the value of a benchmark (in this case, the risk free rate). Beta is the ratio of what the excess return of the fund would be to the excess return of the risk free rate." Morningstar Custom Calculation Data Points[22] at 4.

101.109.     Here, from 2011 to the end of 2022, using a 3-year average, the American Century Target Date 2040 Series had one of the lowest Beta ratings in the Target Date Category and especially low when compared to the two Comparator Funds. This is clearly indicative of a fund that failed to adapt to the better strategies utilized in the Target Date Category and has nothing to do with any intended positive result or strategy employed by the managers of the Series. Such low Beta returns combined with the analysis of actual returns, above, suggest that anyone invested in this fund would be deprived of meaningful returns on their investment and indicates a flawed investment strategy. Had the Plan fiduciaries monitored the Beta of the American Century Target Date Series, they would have seen clearly that the fund would deliver flat returns devoid of any meaningful savings for plan participants' retirement throughout the glide path. The underperforming Beta factors of the American Century Target Date 2040[23] Series, on a 3-year average, ranging from 2011 to 2022 are seen in the graph below:

///
///
///
///
///
///
///
///

---

[22] Available at https://morningstardirect.morningstar.com/clientcomm/customcalculations.pdf last accessed on November 21, 2023.
[23] A Beta analysis for target date years 2030 through 2055 is attached hereto at Appendix "CExhibit "E."



102.110.    In fact, the Morningstar report for the American Century Target Date Series confirms these conclusions. The Morningstar report provides: "American Century One Choice target-date series' adequately resourced team and uninspiring fund lineup merit a renewed Morningstar Analyst Rating of Neutral for its four cheapest share classes and Negative for the two priciest shares." Morningstar Report for American Century Investments Once Choice 2040 Portfolio I Class ARDSX "Morningstar Report")[24] at 1. The Morningstar Report goes on to say: "[t]his target-date series has one of the flattest glide paths in the industry. … the lower equity allocation for most of the glide path means the series' longest-dated vintages have been less sensitive to big stock market swings than peers … ."

103.111.    By choosing or continuing to include the American Century

---

[24] The Morningstar Report is publicly available for through many of its subscription services. For more information please visit www.morningstar.com.

Target Date Series in the Plan despite the clear evidence that the fund had a flawed investment strategy as evidenced by the Series' performance for many years prior to the Class Period and during the Class period as well as the clear evidence that the Series had one of the worst Beta rankings out of the more than 200 funds in the Target Date Category from 2011 to the present, deprived Plan participants of meaningful returns costing them millions in retirement savings needlessly. This Series should have never been selected for the Plan and certainly should not have been permitted to languish in the Plan for years with no action taken by the Plan fiduciaries.

**C. Defendants Had an Imprudent Process to Review Plan investments Because of An Apparent Lack of An Investment Policy Statement**

112.    ERISA does not explicitly require an investment policy statement ("IPS"), but having one is considered prudent practice.  An IPS can serve to facilitate a prudent process for monitoring the investments offered by the plan, which is at the heart of fiduciary conduct.

113.    The Committee Charter appears to contemplate that the Committee shall "adopt an Investment Policy for the Plan, review it periodically and update the Investment Policy when applicable."  Charter, at 2.

114.    However, in response to Plaintiffs' ERISA 104(b) request for all written instruments governing the Plan, including any investment policy statements (*see* allegations *supra*), the Plan administrator did not produce an IPS which leads to the plausible conclusion that the Plan did not have an operative IPS during all or some part of the Class Period.  This then, is in violation of the Committee Charter and against fiduciary best practices.

115.    As further evidence that the Plan did not have an IPS during the Class Period, there is no mention of an IPS in any of the Plan documents, other than the Charter.  Failure to have a written IPS in violation of the Charter is an indication of Defendants lacking a prudent process because they could not "review and monitor the

investment performance of the Plan and oversee compliance with the Investment Policy," if one did not exist.

116.   To the extent that an IPS does exist and the Plan administrator withheld it from Plaintiffs, it only serves to reinforce the notion that Plaintiffs do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan – in part due to Defendants' actions withholding information related to Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plan's investments (*i.e.,* IPS, Committee meeting minutes).

117.   Even if an IPS for the Plan did exist, the fact that the Plan continued to retain the poorly performing Target Date Series for several years when the prudent choice would have been to remove the investments, is an indication that the Plan fiduciaries either did not follow the IPS, which is a breach of fiduciary duty, or the IPS was imprudently written, which is also a breach of fiduciary duty.

118.   Thus, either way, the absence of a written Plan IPS is circumstantial evidence of a breach of fiduciary duty.

**D.  The Fees Associated with the American Century Target Date Series Were Unreasonable Compared to Fees of the Prudent Investment Alternatives**

119.   As noted above, under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

120.   Further, "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b).

121.    Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees…lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

122.    Per the 2022 Disclosure, just as a representative example for the entire Class Period, each of the Target Date year funds had an expense ratio of .42%. *Id.* at A2.  Compared to the Comparator Funds, this cost was higher than the Comparator Funds and the Morningstar median fees, while the American Century funds performed worse than the Comparator Funds.  Thus, investment in the Target Date Series cost Plan participants monetary losses that will impact them over their lifetime:

| Group/Investment | Prospectus Net Expense Ratio | Net Expense Ratio |
| --- | --- | --- |
| **US SA Target-Date 2025** | – | – |
| American Century Retirement Date 2025 X | | 0.42 |
| T. Rowe Price Retirement 2025 Tr-A | | 0.38 |
| *Benchmark 1: Morningstar Lifetime Mod 2025 TR USD* | | |
| *Benchmark 2: Morningstar Lifetime Mod 2025 TR USD* | | |
| *Peer Group:  Morningstar Category = Target-Date 2025* | | |
| *Number of investments ranked* | | |
| *Peer Group Median* | | 0.25 |
| **US SA Target-Date 2030** | – | – |
| American Century Retirement Date 2030 X | | 0.42 |
| T. Rowe Price Retirement 2030 Tr-A | | 0.38 |
| *Benchmark 1: Morningstar Lifetime Mod 2030 TR USD* | | |
| *Benchmark 2: Morningstar Lifetime Mod 2030 TR USD* | | |
| *Peer Group:  Morningstar Category = Target-Date 2030* | | |
| *Number of investments ranked* | | |
| *Peer Group Median* | | 0.28 |
| **US SA Target-Date 2035** | – | – |
| American Century Retirement Date 2035 X | | 0.42 |
| T. Rowe Price Retirement 2035 Tr-A | | 0.38 |

| | | | |
|---|---|---|---|
| *Benchmark 1: Morningstar Lifetime Mod 2035 TR USD* | | | |
| *Benchmark 2: Morningstar Lifetime Mod 2035 TR USD* | | | |
| *Peer Group:  Morningstar Category = Target-Date 2035* | | | |
| *Number of investments ranked* | | | |
| *Peer Group Median* | | | 0.25 |
| **US SA Target-Date 2040** | – | – | |
| American Century Retirement Date 2040 X | | | 0.42 |
| T. Rowe Price Retirement 2040 Tr-A | | | 0.38 |
| *Benchmark 1: Morningstar Lifetime Mod 2040 TR USD* | | | |
| *Benchmark 2: Morningstar Lifetime Mod 2040 TR USD* | | | |
| *Peer Group:  Morningstar Category = Target-Date 2040* | | | |
| *Number of investments ranked* | | | |
| *Peer Group Median* | | | 0.28 |
| **US SA Target-Date 2045** | – | – | |
| American Century Retirement Date 2045 X | | | 0.42 |
| T. Rowe Price Retirement 2045 Tr-A | | | 0.38 |
| *Benchmark 1: Morningstar Lifetime Mod 2045 TR USD* | | | |
| *Benchmark 2: Morningstar Lifetime Mod 2045 TR USD* | | | |
| *Peer Group:  Morningstar Category = Target-Date 2045* | | | |
| *Number of investments ranked* | | | |
| *Peer Group Median* | | | 0.26 |
| **US SA Target-Date 2050** | – | – | |
| American Century Retirement Date 2050 X | | | 0.42 |
| T. Rowe Price Retirement 2050 Tr-A | | | 0.38 |
| *Benchmark 1: Morningstar Lifetime Mod 2050 TR USD* | | | |
| *Benchmark 2: Morningstar Lifetime Mod 2050 TR USD* | | | |
| *Peer Group:  Morningstar Category = Target-Date 2050* | | | |
| *Number of investments ranked* | | | |
| *Peer Group Median* | | | 0.28 |
| **US SA Target-Date 2055** | – | – | |
| American Century Retirement Date 2055 X | | | 0.42 |
| T. Rowe Price Retirement 2055 Tr-A | | | 0.38 |
| *Benchmark 1: Morningstar Lifetime Mod 2055 TR USD* | | | |
| *Benchmark 2: Morningstar Lifetime Mod 2055 TR USD* | | | |
| *Peer Group:  Morningstar Category = Target-Date 2055* | | | |
| *Number of investments ranked* | | | |
| *Peer Group Median* | | | 0.26 |
| **US SA Target-Date 2060** | – | – | |
| American Century Retirement Date 2060 X | | | 0.42 |
| T. Rowe Price Retirement 2060 Tr-A | | | 0.38 |
| *Benchmark 1: Morningstar Lifetime Mod 2060 TR USD* | | | |

SECOND THIRD AMENDED CLASS ACTION COMPLAINT

| | |
|---|---|
| *Benchmark 2: Morningstar Lifetime Mod 2060 TR USD* | |
| *Peer Group:  Morningstar Category = Target-Date 2060* | |
| *Number of investments ranked* | |
| *Peer Group Median* | 0.28 |

123.   Here, had the Plan fiduciaries conducted an impartial review of the Plan's investments they would have easily noticed the Target Date Series were far more expensive than peer funds and the Morningstar benchmarks.

**E. A Securities Lawsuit Against American Century Related to its Target Date Series Underscores the Imprudence of the Target Date Series**

124.   One final factor indicating the imprudence of the American Century Target Date Series relates to a recent proposed securities class action filed in the District of New Jersey.  *See Dale Ylitalo et al. v. Automatic Data Processing, Inc., ADP, Inc., and American Century Investments Services, Inc.,* No. 2:24-cv-07635-JKS-LDW (D.N.J.)

125.   The action was brought against American Century and the other defendants for violations of Sections 12(a)(2) (15 U.S.C. § 77(a)(2)), and 15 (15 U.S.C. § 77o) of the Securities Act of 1933 ("Securities Act"; Sections10(b) (15 U.S.C. § 78j(b)) and 20(a) (15 U.S.C. § 78t(a))of the Securities Exchange Act of 1934 ("Exchange Act"), and Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. 501.201, et seq., and N.J.S.A § 49:3-71.  The proposed class period spans back to 2021, well within the Class Period here.

126.   In essence, the complaint alleges American Century acted in concert with ADP to give unregistered and unlicensed ADP employees improper training to sell the Target Date Series challenged in this Complaint to individual retirement plans.

127.   The complaint alleges the ADP employees were incentivized to push the Target Date Series onto the retirement plans and that American Century knew of "these sales requirements, promotions, and incentives, and encouraged the sale of" the Target Date Series to the retirement plans.  *Id.* at ¶ 58.

128.   The conduct of American Century as described in the lawsuit plausibly suggests that the American Century funds were pushed onto unsuspecting retirement plans, not unlike the Plan, not because of their prudence, but simply to secure profit for American Century.

****

129.   Given the totality of circumstances described above, the American Century Target Date investments were an imprudent investment for the Plan.

**FIRST CLAIM FOR RELIEF**
**Breaches of Fiduciary Duty of Prudence**
**(Asserted against the Committee)**

~~104.~~130.   Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

~~105.~~131.   At all relevant times, the Committee and its members during the Class Period ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

~~106.~~132.   As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

~~107.~~133.   The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint such as failing to make decisions regarding the performance of the funds in the Plan.

1      108.134.    The failure to engage in an appropriate and prudent process resulted

2  in saddling the Plan and its participants with poorly performing funds.

3      109.135.    As a direct and proximate result of the breaches of fiduciary duties

4  alleged herein, the Plan suffered millions of dollars of losses due to excessive costs.

5  Had Defendants complied with their fiduciary obligations, the Plan would not have

6  suffered these losses, and the Plan's participants would have had more money available

7  to them for their retirement.

8      110.136.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence

9  Defendants are liable to restore to the Plan all losses caused by their breaches of

10  fiduciary duties, and also must restore any profits resulting from such breaches.  In

11  addition, Plaintiffs are entitled to equitable relief and other appropriate relief for

12  Defendants' breaches as set forth in their Prayer for Relief.

13      111.137.    The Prudence Defendants knowingly participated in each breach of

14  the other Defendants, knowing that such acts were a breach, enabled the other

15  Defendants to commit breaches by failing to lawfully discharge such Defendant's own

16  duties, and knew of the breaches by the other Defendants and failed to make any

17  reasonable and timely effort under the circumstances to remedy the breaches.

18  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under

19  29 U.S.C. § 1105(a).

20                          **SECOND CLAIM FOR RELIEF**

21                   **Failure to Adequately Monitor Other Fiduciaries**

                     **(Asserted against Cobham and the Board Defendants)**

22      112.138.    Plaintiffs re-allege and incorporate herein by reference all prior

23  allegations in this Complaint as if fully set forth herein.

24      113.139.    Cobham and the Board Defendants (the "Monitoring Defendants")

25  had the authority to appoint and remove members of the Committee, and the duty to

26  monitor the Committee and were aware that the Committee Defendants had critical

27  responsibilities as fiduciaries of the Plan.

28

- 41 -

1    114.140.    In light of this authority, the Monitoring Defendants had a duty to
2  monitor the Committee Defendants to ensure that the Committee Defendants were
3  adequately performing their fiduciary obligations, and to take prompt and effective
4  action to protect the Plan in the event that the Committee Defendants were not fulfilling
5  those duties.

6    115.141.    The Monitoring Defendants also had a duty to ensure that the
7  Committee Defendants possessed the needed qualifications and experience to carry out
8  their duties; had adequate financial resources and information; maintained adequate
9  records of the information on which they based their decisions and analysis with respect
10 to the Plan's investments; and reported regularly to the Monitoring Defendants.

11    116.142.    The Monitoring Defendants breached their fiduciary monitoring
12 duties by, among other things:

13        (a)    Failing to monitor and evaluate the performance of the Committee
14               Defendants or have a system in place for doing so, standing idly by as
15               the Plan suffered significant losses as a result of the Committee
16               Defendants' imprudent actions and omissions;

17        (b)    failing to monitor the processes by which Plan investments were
18               evaluated; and

19        (c)    failing to remove Committee members whose performance was
20               inadequate in that they continued to maintain imprudent, excessively
21               costly, and poorly performing investments within the Plan, all to the
22               detriment of the Plan and the Plan participants' retirement savings.

23    117.143.    As a consequence of the foregoing breaches of the duty to monitor,
24 the Plan suffered millions of dollars of losses.  Had the Monitoring Defendants
25 complied with their fiduciary obligations, the Plan would not have suffered these
26 losses, and Plan participants would have had more money available to them for their
27 retirement.

28

SECONDTHIRD AMENDED CLASS ACTION COMPLAINT

118.144.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiff's counsel as Class Counsel;

C.    A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.    An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.     Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.     An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.     Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.     An award of pre-judgment interest;

J.     An award of costs pursuant to 29 U.S.C. § 1132(g);

K.     An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.     Such other and further relief as the Court deems equitable and just.


Dated:  ~~November 24, 2023~~     July 26, 2024     **ROSMAN & GERMAIN APC**

*/s/ Daniel L. Germain*
Daniel L. Germain
5959 Topanga Canyon Boulevard
Suite 360
Woodland Hills, CA  91367-7503
Telephone: (818) 788-0877
Fax: (818) 788-0885
E-mail: Germain@lalawyer.com

**~~CAPOZZI ADLER, P.C.~~**

*~~/s/ Donald R. Reavey~~*

Donald R. Reavey, Esquire
(admitted *Pro Hac Vice*)
PA Attorney ID #82498
2933 North Front Street
Harrisburg, PA 17110
Telephone:  (717) 233-4101
Fax:  (717) 233-4103
Email:  donr@capozziadler.com

*/s/ Mark K. Gyandoh*
Mark K. Gyandoh, Esquire
(admitted *Pro Hac Vice*)
PA Attorney ID # 88587
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
Telephone:  (610) 890-0200
Fax:  (717) 233-4103
Email:  markg@capozziadler.com

*Counsel for Plaintiffs and the Putative Class*

SECONDTHIRD AMENDED CLASS ACTION COMPLAINT

## **CERTIFICATE OF SERVICE**

I hereby certify that on ~~November 24, 2023~~*July 26, 2024*, a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.

By:  *~~Donald R. Reavey~~Mark K. Gyandoh*
     ~~Donald R. Reavey~~Mark K. Gyandoh, Esq.

---

- 46 -

~~SECOND~~THIRD AMENDED CLASS ACTION COMPLAINT