UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MICHAEL PHILLIPS, et al.,

Plaintiffs,

v.

COBHAM ADVANCED ELECTRONIC
SOLUTIONS, INC., et al.,

Defendants.

Case No. 23-cv-03785-EKL

**ORDER GRANTING MOTION TO
DISMISS IN PART**

Re: Dkt. No. 82

In this action brought under the Employee Retirement Income Security Act ("ERISA"), Plaintiffs claim that Defendants breached their fiduciary duty of prudence by including allegedly poor investments in the Cobham 401(k) retirement plan (the "Plan"). Now before the Court is Defendants' motion to dismiss the fourth amended complaint. Mot. to Dismiss, ECF No. 82 ("Mot."). The Court carefully reviewed the parties' briefs, issued a tentative ruling, and heard argument on September 17, 2025. For the following reasons, the Court GRANTS in part and DENIES in part the motion to dismiss.

I.    **BACKGROUND**

At its core, this case turns on whether Defendants imprudently included the American Century Target Date Series of funds in the Plan. The Plan is a "defined contribution plan covering substantially all eligible employees of Cobham." Fourth Am. Compl. ¶ 40, ECF No. 81 ("FAC"). Cobham employees can make direct contributions to their accounts, and Cobham makes certain matching payments as well. *See id.* ¶¶ 42-27. The Plan is "among the largest [retirement] plans in the United States," with "over $746 million dollars in assets under management in 2017" and more than "$930 million in assets" by the end of 2020. *Id.* ¶ 8.

United States District Court
Northern District of California

The American Century Target Date Series is a type of investment known as a target date fund ("TDF"). Target date funds "are a staple in almost every defined contribution plan." *Id.* ¶ 88. These funds provide "asset-class diversity through a blend of stocks and bonds," and the portfolios are "adjusted for lower risk as they approach a designated target date of retirement." *Id.* The general concept is to help an investor build wealth by investing in riskier, higher-yield assets (*e.g.*, stocks) early on, and to preserve wealth later in the investment cycle by shifting to less volatile assets with more predictable returns (*e.g.*, bonds). *See id.* ¶¶ 128-130. In addition to preserving wealth, the shift to less volatile assets may reduce the risk that a retiree will need to draw from their account at a loss during market downturns. Like other TDFs, the American Century TDFs are divided into a series of five-year vintages (*e.g.*, 2025, 2030, and so on), with each vintage corresponding to an expected retirement year. Since 2015, the American Century TDFs have been "included in the Plan's menu of investment offerings." *Id.* ¶¶ 54-57. Plaintiffs each invested in the American Century TDFs through their Plan accounts. *Id.* ¶¶ 16-18. Plaintiffs claim that they "suffered injury to [their] Plan account[s] from the underperformance and excessive expense" of the American Century TDFs. *Id.*

On July 28, 2023, Plaintiffs filed the original complaint in this action, alleging breach of the fiduciary duty of prudence and failure to adequately monitor fiduciaries. *See* Compl. ¶¶ 113-127, ECF No. 1. On October 13, 2023, Plaintiffs filed the first amended complaint pursuant to stipulation. *See* First Am. Compl., ECF No. 24. After Defendants moved to dismiss that complaint, rather than opposing the motion, Plaintiffs filed a second amended complaint, also by stipulation. Second Am. Compl., ECF No. 35 ("SAC").

As with the prior complaints, the second amended complaint asserted breach of the duty of prudence and failure to monitor. *Id.* ¶¶ 104-118. The cornerstone of Plaintiffs' theory was that the American Century TDFs were poor investments because they underperformed relative to other investments – so-called "comparator funds." First MTD Order at 4, 13-14, ECF No. 53 (summarizing allegations). Judge Davila held that these allegations were insufficient as a matter of law because "poor performance, standing alone, is not sufficient to create a reasonable inference that plan fiduciaries failed to conduct an adequate investigation." *White v. Chevron*

*Corp.*, No. 16-cv-0793, 2017 WL 2352137, at *20 (N.D. Cal. May 31, 2017), *aff'd*, 752 F. App'x 453 (9th Cir. 2018); *Bracalente v. Cisco Sys., Inc.*, No. 22-cv-04417, 2023 WL 5184138, at *3 (N.D. Cal. Aug. 11, 2023) ("*Bracalente I*").  Because the underperformance allegations were legally insufficient, Judge Davila did not address whether the comparator funds were similar enough to the American Century TDFs to serve as meaningful benchmarks.  However, Judge Davila "encourage[d] Plaintiffs to add allegations as to the propriety of the [c]omparator [f]unds."  First MTD Order at 14.  Judge Davila also instructed Plaintiffs to "add allegations of Defendants' omissions or conduct, or other relevant information."  *Id.*

On August 20, 2024, the case was reassigned to this Court.  *See* Order Reassigning Case, ECF No. 57.  Plaintiffs filed a third amended complaint.  Third Am. Compl., ECF No. 56 ("TAC").  The new complaint asserted essentially the same allegations that the American Century TDFs underperformed, without heeding Judge Davila's instruction to add more detail about the comparator funds.  *Id.* ¶¶ 70-111; *see also* TAC (Redlined Version) at 24-35, ECF No. 68 (reflecting non-substantive amendments to these allegations).  The Court held that Plaintiffs' underperformance allegations were insufficient because Plaintiffs failed to compare the American Century TDFs to meaningful benchmarks.  *See* Second MTD Order at 3, ECF No. 75.  The Court also held that Plaintiffs' other allegations of imprudence were insufficient.  *See id.* at 2, 4-5.  The Court dismissed the third amended complaint with leave to amend, providing Plaintiffs with one final opportunity to cure these pleading deficiencies.  *Id.* at 6.

On April 18, 2025, Plaintiffs filed the operative fourth amended complaint, asserting three causes of action.  First, Plaintiffs allege that the Plan's Committee breached its duty of prudence.[1] FAC ¶¶ 234-241.  Second, Plaintiffs allege that Cobham and its Board failed to adequately

---

[1] Defendant Cobham Advanced Electronic Solutions, Inc. ("Cobham") serves as the "named fiduciary, Plan Sponsor and Plan administrator."  FAC ¶ 22.  Cobham appointed the 401(k) Plan Committee of CAES Systems, LLC and/or the 401(k) Plan Committee of Cobham Advanced Electronic Solutions, Inc. ("Committee") to "ensure that the investments available to the Plan's participants are appropriate, had no more expense than reasonable and performed well as compared to their peers."  *Id.* ¶ 23.  The Committee Defendants include the Committee and "unnamed members of the Committee during the Class Period."  *Id.* ¶ 31.  The Board Defendants include the "Board of Directors of CAES Systems, LLC and/or the Board of Directors of Cobham Advanced Electronic Solutions, Inc. and its members during the Class Period."  *Id.* ¶¶ 1, 25-27.

monitor the Committee.  *Id.* ¶¶ 242-248.  Third, Plaintiffs allege that Cobham, its Board, and the Committee failed to furnish governing plan documents in violation of 29 U.S.C. § 1024(b)(4).  *Id.* ¶¶ 249-252.  Defendants move to dismiss all claims.

## II.    REQUEST FOR JUDICIAL NOTICE

In ruling on a Rule 12(b)(6) motion, courts generally do not consider material outside the pleadings.  *United States v. Corinthian Colls.*, 655 F.3d 984, 998 (9th Cir. 2011).  Courts may consider facts that are "not subject to reasonable dispute" because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  But even under those circumstances, courts may not take judicial notice of materials for the purpose of creating a defense against the well-pleaded allegations in the complaint.  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018).

Here, Defendants ask the Court to take judicial notice of fifteen exhibits in support of their motion to dismiss.  *See* Req. for Judicial Notice, ECF No. 83; *see also* McMahan Decl., ECF No. 84 (attaching Exhibits 1 through 15).  Plaintiffs oppose, arguing that Defendants use the exhibits "to create counter-factual arguments that are neither correct nor appropriate at this stage."  Opp. at 2, ECF No. 85.  With the exception of Exhibit 6, Defendants' request for judicial notice is denied.  The primary purpose of Exhibits 1 through 5 and 7 through 15 is to supply additional information about the American Century TDFs and comparator funds to contradict Plaintiffs' allegations that the American Century TDFs were imprudent investments.  The Court may not consider these materials for that purpose.  *Khoja*, 899 F.3d at 1002.

The Court will consider Defendants' Exhibit 6, which is a transcript of the December 2024 hearing on Defendants' motion to dismiss the third amended complaint.  Defendants cite this exhibit for a proper purpose – *i.e.*, addressing whether Plaintiffs have cured prior pleading deficiencies – and the Court may take judicial notice of its own files and records in this case.  *Norton v. LVNV Funding, LLC*, 396 F. Supp. 3d 901, 909 (N.D. Cal. 2019).

## III.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a court must dismiss a complaint if it fails to state a claim upon which relief can be granted.  To avoid dismissal, the plaintiff must allege

United States District Court
Northern District of California

4

"enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the pleaded facts allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When there are "two possible explanations, only one of which can be true and only one of which results in liability, plaintiffs cannot offer allegations that are 'merely consistent with' their favored explanation but are also consistent with the alternative explanation." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). "Something more is needed, such as facts tending to exclude the possibility that the alternative explanation is true, in order to render plaintiffs' allegations plausible within the meaning of *Iqbal* and *Twombly*." *Id.* (citing *Twombly*, 550 U.S. at 554).

For purposes of a Rule 12(b)(6) motion, the court generally "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, the court need not "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam) (quoting *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981)).

## IV.    DISCUSSION

Plaintiffs allege that the Plan's Committee breached its duty of prudence by selecting and retaining the American Century TDFs, which "wasted the assets of the Plan and the assets of participants because of unnecessary costs and predictable underperformance." FAC ¶ 79. Plaintiffs also assert a claim for failure to monitor the Committee, which is derivative of the breach of prudence claim. Finally, Plaintiffs assert a new claim in the fourth amended complaint, asserting that all Defendants failed to furnish the Plan's Investment Policy Statement ("IPS") in violation of ERISA § 104. *See* 29 U.S.C. § 1024(b)(4). The Court addresses each claim in turn.

### A.    Breach of the Duty of Prudence

"To state a claim for breach of fiduciary duty under ERISA, a plaintiff must allege that (1) the defendant was a fiduciary; [ ] (2) the defendant breached a fiduciary duty; and (3) the

United States District Court
Northern District of California

United States District Court
Northern District of California

1 plaintiff suffered damages." *Bafford v. Northrop Grumman Corp.*, 994 F.3d 1020, 1026 (9th Cir.

2 2021) (citing 29 U.S.C. § 1104(a)(1)(B)). Here, Plaintiffs allege that Defendants violated their

3 duty of prudence. *See* 29 U.S.C. § 1104(a)(1). In carrying out the duty of prudence, a fiduciary

4 must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that

5 a prudent man acting in a like capacity and familiar with such matters would use in the conduct of

6 an enterprise of a like character and with like aims[.]" *Id*. § 1104(a)(1)(B). In the ERISA context,

7 a fiduciary has a "duty to exercise prudence in selecting investments at the outset" and "a

8 continuing duty to monitor trust investments and remove imprudent ones." *Tibble v. Edison Int'l*,

9 575 U.S. 523, 529 (2015) ("*Tibble I*").

10       A motion to dismiss "requires careful judicial consideration of whether the complaint

11 states a claim that the defendant has acted imprudently." *Fifth Third Bancorp v. Dudenhoeffer*,

12 573 U.S. 409, 425 (2014). "Because the content of the duty of prudence turns on 'the

13 circumstances . . . prevailing' at the time the fiduciary acts, the appropriate inquiry will necessarily

14 be context specific." *Id*. (quoting 29 U.S.C. § 1104(a)(1)(B)). "The inquiry centers not on the

15 results of an investment, but on a fiduciary's process for choosing that investment." *Pizarro v.*

16 *Home Depot, Inc*., 111 F.4th 1165, 1173 (11th Cir. 2024); *id*. at 1171 ("ERISA requires a prudent

17 process, but it does not guarantee good results.").

18       An ERISA plaintiff may allege imprudence through direct evidence of a flawed investment

19 process or circumstantial evidence relating to the investments that the fiduciary selected.

20 However, there are limits on the inferences a court may draw from circumstantial allegations that

21 an investment underperformed. First, because prudence is evaluated "prospectively, based on the

22 methods the fiduciaries employed, rather than retrospectively, based on the results they achieved,

23 it is not enough for a plaintiff simply to allege that the fiduciaries could have obtained better

24 results – whether higher returns, lower risks, or reduced costs – by choosing different

25 investments." *Anderson v. Intel Corp. Inv. Pol'y Comm.*, 137 F.4th 1015, 1021 (9th Cir. 2025).

26 Second, because "the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, .

27 . . courts must give due regard to the range of reasonable judgments a fiduciary may make based

28 on her experience and expertise." *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022).

It follows from these principles that "ERISA fiduciaries are not required to adopt a riskier strategy simply because that strategy may increase returns.  To the contrary, courts have routinely rejected claims that an ERISA fiduciary can violate the duty of prudence by seeking to minimize risk."  *Anderson*, 137 F.4th at 1024 (quotation omitted); *see also White*, 752 F. App'x at 455 (affirming dismissal where "allegations showed only that [the defendant] could have chosen different vehicles for investment that performed better during the relevant period, or sought lower fees for administration of the fund"); *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 486 (8th Cir. 2020) ("[F]iduciaries are not required to pick 'the best performing fund.'" (quoting *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018))).

Here, Plaintiffs rely on several categories of allegations to support their claim that the Plan's Committee acted imprudently.  Plaintiffs allege that:  (1) the American Century TDFs underperformed compared to several different benchmarks and performance metrics; (2) the American Century TDFs charged relatively high management fees; and (3) the Committee ignored information provided by the Plan's third-party investment advisor.  For the following reasons, the Court finds all of these allegations insufficient to state a claim for breach of the duty of prudence.

### 1.     Underperformance allegations

"[W]hen a plaintiff alleges imprudence based on a fiduciary's decision to make one investment rather than an alternative, '[t]he key to nudging an inference of imprudence from possible to plausible is providing a sound basis for comparison – a meaningful benchmark – not just alleging that costs are too high, or returns are too low.'" *Anderson*, 137 F.4th at 1022 (quoting *Matousek v. MidAmerican Energy Co*., 51 F.4th 274, 278 (8th Cir. 2022)).  "[T]o the extent a plaintiff asks a court to infer that a fiduciary used improper methods based on the performance of the investments, . . . he must compare that performance to funds or investments that are meaningfully similar." *Id*. at 1023.  At the motion to dismiss stage, courts must "assess the similarities and differences between [the plaintiff's] chosen comparators and the [challenged] funds so that it could determine whether they were appropriate comparators." *Id*. at 1025.

Here, Plaintiffs allege that the American Century TDFs underperformed relative to three types of benchmarks:  (1) a peer group of TDFs categorized by the investment research company

1    Morningstar; (2) an index that measures the performance of a group of TDFs ("S&P Index"); and

2    (3) seven comparator funds.  Plaintiffs also point to other measures of underperformance,

3    including the Plan's "Beta" rating and other evaluations by Morningstar known as Morningstar

4    "medalist rankings" and "star ratings."  The crux of these allegations is that the American Century

5    TDFs were too risk averse and missed out on potentially higher returns.

6                    a.    **Morningstar benchmarks**

7          According to the complaint, Morningstar "is the most accepted source of investment

8    performance information."  FAC ¶ 73.  "Morningstar is used and trusted by virtually all financial

9    professionals" – including Precept, the Plan's investment advisor.  *Id.* ¶¶ 75, 99-103, 115.  Here,

10   Plaintiffs compare the American Century TDFs to the median outcome of funds within the

11   Morningstar target date "peer group" – which is a category of funds that Morningstar analyzes

12   together based on "their actual investment style" and "their portfolio holdings."  *Id.* ¶¶ 112-113.

13         As the Court previously held, the Morningstar peer group, which includes "more than 200

14   funds," *id.* ¶ 200, is not a meaningful benchmark for evaluating the American Century TDFs'

15   performance, Second MTD Order at 3.  "[S]imply labeling funds as comparable or as in the same

16   category . . . is insufficient to establish that those funds are meaningful benchmarks."  *Anderson v.*

17   *Intel Corp. Inv. Pol'y Comm.*, 579 F. Supp. 3d 1133, 1155 (N.D. Cal. 2022) (holding that

18   "Morningstar 'peer group categories' are inappropriate benchmarks . . . because the[y] . . . are an

19   average of a large group of funds"), *aff'd*, 137 F.4th 1015 (9th Cir. 2025).  Because the

20   Morningstar peer group includes a variety of different investment alternatives that may employ

21   different "risk mitigation strategies and objectives," *Anderson*, 137 F.4th at 1023, comparing the

22   American Century TDFs to the median outcome in the category is not meaningful.  Moreover,

23   because the Morningstar Index is based on the Morningstar peer group, comparing the American

24   Century TDFs to that index is inadequate for the same reasons.  *See* FAC ¶¶ 108-109.

25         In any event, Plaintiffs do not adequately allege that the American Century TDFs

26   underperformed the Morningstar peer group median.  To the contrary, as reflected in Exhibit D to

27   the fourth amended complaint (reproduced below), the American Century TDFs outperformed the

28   Morningstar peer group median every other year between 2017 and 2023.  Specifically, in 2018

United States District Court
Northern District of California

8

United States District Court
Northern District of California

and 2022, when the market experienced downturns, every vintage of the American Century TDFs outperformed the median – and in 2020, six of eight vintages outperformed the median.  By outperforming the median, the American Century TDFs necessarily outperformed more than half of the TDFs in their peer group.  This track record does not permit an inference that the Plan's Committee was "asleep at the wheel" and "failed to pay close enough attention" to the Plan's investments.  *See Davis*, 960 F.3d at 483.  Rather, "the complaint suggests that the fiduciaries' choices had their intended effects" of mitigating risk during market downturns because the American Century TDFs "underperformed . . . in 'up' [periods], but overperformed in 'down' [periods] – precisely the tradeoff" that the Committee anticipated.  *Anderson*, 137 F.4th at 1025.

## Peer Group Median Comparison

| | 1/1/16 12/31/16 | 1/1/17 12/31/17 | 1/1/18 12/31/18 | 1/1/19 12/31/19 | 1/1/20 12/31/20 | 1/1/21 12/31/21 | 1/1/22 12/31/22 | 1/1/23 12/31/23 |
|---|---|---|---|---|---|---|---|---|
| **Target-Date 2020** | | | | | | | | |
| American Century Retirement Date 2020 II | 6.40 | 11.21 | | | | | | |
| *Peer Group Median* | 7.06 | 13.24 | | | | | | |
| **Target-Date 2025** | | | | | | | | |
| American Century Retirement Date 2025 X | 6.61 | 12.43 | -4.66 | 17.44 | 11.80 | 9.78 | -13.47 | 11.62 |
| *Peer Group Median* | 7.26 | 14.19 | -5.13 | 18.50 | 12.07 | 10.35 | -13.99 | 12.35 |
| **Target-Date 2030** | | | | | | | | |
| American Century Retirement Date 2030 X | 6.73 | 13.71 | -5.22 | 18.79 | 13.16 | 10.48 | -14.41 | 12.38 |
| *Peer Group Median* | 7.88 | 16.72 | -6.06 | 20.69 | 13.38 | 12.34 | -15.20 | 14.24 |
| **Target-Date 2035** | | | | | | | | |
| American Century Retirement Date 2035 X | 6.98 | 14.91 | -5.73 | 20.19 | 14.34 | 11.26 | -15.19 | 13.26 |
| *Peer Group Median* | 8.23 | 18.30 | -6.84 | 22.32 | 13.98 | 14.34 | -16.19 | 16.28 |
| **Target-Date 2040** | | | | | | | | |
| American Century Retirement Date 2040 X | 7.29 | 16.33 | -6.17 | 21.54 | 15.67 | 11.96 | -16.01 | 14.13 |
| *Peer Group Median* | 8.76 | 19.58 | -7.73 | 23.92 | 14.95 | 16.14 | -16.87 | 17.94 |
| **Target-Date 2045** | | | | | | | | |
| American Century Retirement Date 2045 X | 7.65 | 17.82 | -6.74 | 23.00 | 16.97 | 12.85 | -16.55 | 14.87 |
| *Peer Group Median* | 8.89 | 20.41 | -8.08 | 24.84 | 15.14 | 17.37 | -17.66 | 19.42 |
| **Target-Date 2050** | | | | | | | | |
| American Century Retirement Date 2050 X | 7.90 | 18.90 | -7.27 | 24.35 | 18.16 | 13.92 | -16.99 | 15.68 |
| *Peer Group Median* | 8.98 | 20.77 | -8.31 | 25.04 | 15.57 | 17.44 | -17.71 | 19.50 |
| **Target-Date 2055** | | | | | | | | |
| American Century Retirement Date 2055 X | 8.23 | 19.46 | -7.61 | 24.86 | 18.51 | 14.48 | -17.19 | 16.32 |
| *Peer Group Median* | 8.98 | 20.74 | -8.35 | 25.59 | 15.28 | 18.14 | -18.23 | 20.49 |
| **Target-Date 2060** | | | | | | | | |
| American Century Retirement Date 2060 X | 8.15 | 19.71 | -7.76 | 25.36 | 18.91 | 14.89 | -17.30 | 16.57 |
| *Peer Group Median* | 9.21 | 20.77 | -8.31 | 25.26 | 15.63 | 17.74 | -17.79 | 19.58 |

Despite some similarities, different TDFs offer different investment strategies. "In years when the equity market is hot, a more aggressive target date fund that retains equities longer will appear to outperform a fund that shifts toward more conservative assets like bonds sooner. But that snapshot does not mean it is objectively imprudent to adopt a more conservative strategy – the tables turn when the market is down." *Pizarro v. Home Depot, Inc.*, 111 F.4th 1165, 1180 (11th Cir. 2024), *petition for cert. filed* (U.S. Dec. 6, 2024) (No. 24-620). "There is nothing presumptively imprudent about a retirement plan retaining investments 'through periods of underperformance as part of a long-range investment strategy.'" *Wehner v. Genentech, Inc.*, No. 20-cv-06894-WHO, 2021 WL 507599, at *9 (N.D. Cal. Feb. 9, 2021) (quotation omitted) (collecting cases); *see also Smith v. CommonSpirit Health*, 37 F.4th 1160, 1166 (6th Cir. 2022).[2] In sum, based on the American Century TDFs' alleged track record, the Committee's choice to invest in and retain them in the Plan was not outside the "range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes*, 595 U.S. at 177. Accordingly, Plaintiffs' allegations comparing the American Century TDFs to the Morningstar peer group do not support an inference that the Committee breached its duty of prudence.

### b.    S&P Index

Plaintiffs also allege that the American Century TDFs underperformed relative to the S&P Index. FAC ¶¶ 179-191. These allegations are conceptually similar to the Morningstar peer group allegations because the S&P Index measures the performance of a *group* of target date funds. It is not an actual alternative investment that the Plan could have selected to replace the American Century TDFs. *See* Compl. Ex. C at B22 ("Benchmark indices are unmanaged, and you cannot

---

[2] Plaintiffs also allege that the American Century TDFs underperformed the Morningstar benchmarks during certain five-year periods. FAC ¶ 162. Notably, Plaintiffs did not include data for the five-year periods ending in 2020 or 2022, when the American Century TDFs outperformed the peer group median. Focusing only on the data Plaintiffs do allege, the American Century TDF vintages outperformed the Morningstar benchmark on a five-year basis 12 out of 28 times. *See* FAC at 36-40 (using red boxes to reflect the five-year periods when the American Century TDFs outperformed the Morningstar benchmark). These allegations further support that the American Century TDFs were a reasonable investment. And even when a fund fails to achieve above-median results over a five-year period, that does not make it an imprudent investment. *See Smith*, 37 F.4th at 1166 ("Any other rule would mean that every actively managed fund with below-average results over the most recent five-year period would create a plausible ERISA violation.").

United States District Court
Northern District of California

invest directly in an index.").  Like the Morningstar peer group, the S&P Index may include many different TDFs with varying strategies – their only similarity is that they are TDFs with "to retirement" glidepaths.  Plaintiffs do not allege any other details about the underlying TDFs measured by the S&P Index, including their asset allocations or other considerations like fees.  Accordingly, the Court cannot infer that the TDFs measured by the S&P Index are "meaningfully similar" to the American Century TDFs.  *Anderson*, 137 F.4th at 1023.

In any event, Plaintiffs' underperformance allegations do not suggest that Defendants acted imprudently.  Plaintiffs allege that the American Century TDFs underperformed the S&P Index in terms of annualized returns from January 1, 2015, through December 31, 2024.  But the complaint makes clear that every vintage of the American Century TDFs earned *positive* annualized returns over that ten-year period.  *See* FAC at 54 (chart).[3]  Thus, Plaintiffs' theory is that the Committee acted imprudently by making *long-term positive investments* because it could have invested in other, unspecified funds with unknown strategies that performed even better.  This theory fails as a matter of law.  *See Anderson*, 137 F.4th at 1021; *see also White*, 2017 WL 2352137, at *10 ("A fiduciary may reasonably select an investment alternative in view of its different risks and features, even if that investment option turns out to yield less than some other option."), *aff'd*, 752 F. App'x 453 (9th Cir. 2018).

### c.    Other TDFs

Plaintiffs identify seven other TDF options that allegedly serve as meaningful benchmarks for the American Century TDFs.  FAC ¶ 117 (listing "American Funds, Callan GlidePath Funds, MoA Clear Passage Funds, Natixis Funds, Nuveen Lifecycle Funds, T. Rowe Price Retirement Funds, and Voya Target Retirement Funds" as benchmarks).  Plaintiffs allege that all seven comparator funds and the American Century TDFs are similar because they "are grouped in the same Morningstar Category," they "are large blend style funds," and "all have a significant degree

---

[3] It is also notable that the American Century TDFs "underperformed" the index by as little as 0.17% (2025 vintage), and by at most 0.99% (2040 vintage) over the ten-year period.  *See* FAC at 54 (chart).  And Plaintiffs acknowledge that, when looking at shorter time periods, some American Century TDF vintages outperformed the S&P Index.  *Id.* ¶ 189.

United States District Court
Northern District of California

of active management, or are purely actively managed." *Id*. ¶¶ 119-123. But these features are common to most, if not all, target date funds. *See, e.g.*, *id.* ¶ 121 (alleging that "every target-date manager makes active decisions in building a glide path and selecting asset classes"), ¶ 200 (alleging that there are "more than 200 funds" in the Morningstar target date category). Thus, these allegations simply restate Plaintiffs' prior, insufficient allegations that the comparators are meaningful benchmarks because they are all target date funds. *See supra* Section IV.A.1.a.

Additionally, the complaint alleges significant differences between the American Century TDFs and the seven comparator funds. First, Plaintiffs claim that the "asset allocation is sufficiently similar across all funds," FAC ¶ 125, but the cited data shows meaningful differences in investment strategies. The American Century TDFs had an asset allocation of about 67% more volatile assets (*i.e.*, stocks) and about 33% less volatile assets (*i.e.*, bonds and cash). *See id*. ¶ 125. By contrast, each of the seven comparator funds allocated between 80% and 94% of their assets to stocks. *Id*. (comparing Natixis at one end of the range to T. Rowe Price at the other end). These asset allocations reflect fundamentally different investment strategies and risk preferences, thus the comparator funds are not meaningful benchmarks.[4] *See Anderson*, 137 F.4th at 1023 (plaintiffs improperly compared the challenged fund "to equity-heavy retail funds that pursued different objectives – typically revenue generation"); *Davis*, 960 F.3d at 485-86 (holding that comparator funds were "not close enough" because they held "a lower percentage of international stocks" than the challenged fund held); *Meiners*, 898 F.3d at 823 & n.2 (affirming dismissal where the challenged fund had "a higher allocation of bond[s]" than the comparator fund).[5]

Second, the American Century TDFs have a different glide path than six of the seven comparator funds. FAC ¶¶ 149-154. A glide path refers to changes in a fund's mix of

---

[4] The TDFs in the Morningstar peer group as a whole also allocated about 80% of their assets to stocks, FAC ¶ 125, which is another reason why the Morningstar peer group is not a meaningful benchmark. *See supra* Section IV.A.1.a.

[5] Plaintiffs argue that the American Century TDFs and the comparator funds are similar enough because they each held more stocks than bonds. *See* FAC ¶ 126. This argument compares the TDFs too abstractly and thus amounts to the same incorrect argument that all TDFs are meaningful benchmarks for each other. *See id.* ¶¶ 88, 124 (alleging that a defining feature of TDFs generally is that they include "a blend of stocks and bonds").

United States District Court
Northern District of California

investments over time.  *See id.* ¶ 128.  Whereas some funds reach their most conservative mix of investments at the year of expected retirement (a "to retirement" glide path), others reach their most conservative mix after retirement (a "through retirement" glide path).  *See id.* ¶¶ 129-130. Different glide paths therefore reflect different investment and risk-mitigation strategies.  *Id.* ¶ 130 (alleging that "to" glide paths focus on "limiting the volatility or the variability of outcomes for the investor up to retirement," whereas "through" glide paths "drive[] growth").  These differences make the comparator funds poor benchmarks.  *See Bracalente v. Cisco Sys., Inc.*, No. 22-cv-04417, 2024 WL 2274523, at *8 (N.D. Cal. May 20, 2024) ("*Bracalente II*").  The only comparator fund that follows a "to" glide path is the Voya Target Retirement Fund.  FAC ¶ 148. But the Voya fund is not a meaningful benchmark because its asset allocation differs significantly, investing nearly 90% in stocks compared to the American Century TDFs' more conservative allocation of 67% in stocks.  *See id.* ¶ 125.[6]

Plaintiffs also argue that "to" glide path TDFs are "unfavored" because the market volatility they protect against has "proven to be inconsequential," and a "through" glide path provides "more secure long-term income."  *Id.* ¶ 134.  This argument improperly seeks to replace the Committee's own judgment with Plaintiffs' personal investment preferences.  There is nothing *per se* imprudent about a fiduciary choosing a "to" glide path to mitigate risk.  As Plaintiffs acknowledge, 29% of TDFs adopt a "to" glide path.  *Id.* ¶ 133.  The Court "must give due regard" to the Committee's selection of a "to" glide path to mitigate risk because it falls within "the range of reasonable judgments a fiduciary may make based on her experience and expertise."  *Hughes*, 595 U.S. at 177; *Anderson*, 137 F.4th at 1024 ("ERISA fiduciaries are not required to adopt a riskier strategy simply because that strategy may increase returns.").

---

[6] Plaintiffs' allegations here are materially different from those in *Davis v. Salesforce.com, Inc.*, No. 21-15867, 2022 WL 1055557 (9th Cir. Apr. 8, 2022).  In *Salesforce.com*, the Ninth Circuit reversed dismissal where defendants failed to switch to an alternative fund that had "the same underlying investments and asset allocations" but had "better annual returns and a lower net expense ratio."  *Id.* at *2.  Here, the American Century TDFs and comparator funds have materially different underlying investments.

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### d.     Beta ratings

Plaintiffs allege that the American Century TDFs were a poor investment because they had "one of the lowest Beta ratings in the Target Date Category and especially low when compared to two of the comparator funds." FAC ¶ 198.  These allegations are merely another way of stating that the American Century TDFs underperformed compared to the alleged benchmarks discussed above.  *See* First MTD Order at 13-14 (holding that Plaintiffs' allegations regarding Beta "are mere restatements of the proposition that underperformance is a sufficient basis to find a breach of the duty of prudence").  Because the benchmarks are not meaningful, these allegations are insufficient as well.

Plaintiffs' allegations regarding Beta ratings fail for another reason.  According to Morningstar's definition, neither a higher nor lower Beta rating is inherently better for investment purposes.  Rather, Beta is a measure of risk associated with an investment.  *See* FAC ¶ 196.  For example, a Beta of 1.10 indicates that an investment "performed 10% better than its benchmark in up markets and 10% worse in down markets."  Morningstar, *Custom Calculation Data Points* (October 2016), https://morningstardirect.morningstar.com/clientcomm/customcalculations.pdf (cited at FAC ¶ 196).  By contrast, "a Beta of 0.85 indicates that the portfolio's excess return is expected to perform 15% worse than the benchmark[] . . . during up markets and 15% better during down markets."  *Id*.  Here, the American Century TDFs allegedly had a Beta rating below 1.0, *see* FAC ¶ 200, meaning that they were generally more insulated from market volatility and performed better during down markets, at the expense of missing some potential upside.  Once again, this is "precisely the tradeoff" that the Committee anticipated.  *Anderson*, 137 F.4th at 1025.  In sum, Plaintiffs' allegations about Beta ratings are another iteration of the legally deficient theory that the Committee acted imprudently by choosing to mitigate risk.

### e.     Morningstar Ratings

Plaintiffs allege that the American Century TDFs were poor investments based on two ratings provided by Morningstar.  Plaintiffs rely on Morningstar's "medalist ratings," which provide a "forward-looking analysis of investment strategies" on a scale of "Gold, Silver, Bronze, Neutral and Negative."  FAC ¶ 203.  According to the complaint, the medalist ratings "indicate

1    which investments Morningstar believes are likely to outperform a relevant index or peer group

2    average on a risk-adjusted basis over time." *Id.*  Plaintiffs do not allege that the medalist ratings

3    *accurately predict* which investments perform well.  In any event, Plaintiffs allege that the

4    American Century TDFs consistently achieved "neutral" – not "negative" – ratings throughout the

5    relevant period. *Id.* ¶¶ 207-214.  The Court cannot infer imprudence from neutral ratings just

6    because Morningstar rated some other investments higher.[7]

7        Plaintiffs also rely on Morningstar's "star rating," which is a "quantitative, backward-

8    looking measure of a fund's past performance, measured from one to five stars." *Id.* ¶ 202.

9    Plaintiffs cite a snapshot from 2023, at which point the American Century TDFs were ranked one,

10   two, or three stars depending on vintage. *Id.* ¶ 215.  This limited allegation about 2023 does not

11   suggest that the Committee acted imprudently when it selected the American Century TDFs

12   beginning in 2015.  The Court also cannot infer that the Committee improperly retained the

13   American Century TDFs based on this snapshot considering the other substantial allegations that

14   the funds yielded positive annualized returns from 2015 through 2024 and frequently performed

15   above median.

16                    **2.    Fee allegations**

17       Plaintiffs also allege that the American Century TDFs were imprudent investments because

18   they charged relatively high investment management fees.  "[A] trustee cannot ignore the power

19   the trust wields to obtain favorable investment products, particularly when those products are

20   substantially identical – other than their lower cost – to products the trustee has already selected."

21   *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) (en banc) ("*Tibble II*").  But this is not

22   a case where Defendants failed to obtain a favorable investment.  To the contrary, the American

23   Century TDFs yielded positive returns and outperformed the median TDF in their Morningstar

24   peer group with significant frequency, particularly during market downturns.  *See supra* Section

25

26   _____

27   [7] Notably, some of the comparator funds also achieved "neutral" ratings – including the Voya
     fund, which was consistently rated "neutral."  *See id.* ¶¶ 207-214.  The Morningstar medalist
     ratings for comparator funds are incorporated by reference in the complaint because Plaintiffs

28   reference the ratings extensively and they form the basis of Plaintiffs' claims of imprudence.

United States District Court
Northern District of California

IV.A.1.a.  Nor is this a case where Defendants inexplicably invested in a higher-cost version of a fund when an identical, lower-cost version was available.[8]

Here, the crux of Plaintiffs' argument is that it was imprudent for the Committee to select and retain the American Century TDFs when other, materially different investment options offered lower fees.  *See* FAC ¶ 223 (comparing to the Morningstar peer group and comparator funds discussed above).  The fact that some other funds charged lower fees does not support a plausible inference that the American Century TDFs charged *unreasonable* fees.  The Committee was not "required to pick the lowest-cost fund, particularly when the expense-ratio differences are small[.]"  *Davis*, 960 F.3d at 486 (quoting *Meiners*, 898 F.3d at 823); *see also Partida v. Schenker, Inc.*, No. 22-cv-09192-AMO, 2024 WL 1354432, at *7 (N.D. Cal. Mar. 29, 2024) ("[T]he mere availability of cheaper alternatives does not establish a breach of the duty of prudence."); *Meiners*, 898 F.3d at 823-24 ("[T]he existence of a cheaper fund does not mean that a particular fund is too expensive in the market generally or that it is otherwise an imprudent choice.").  Accordingly, Plaintiffs' fee allegations do not suggest imprudence.

### 3.    Process allegations

Finally, Plaintiffs attempt to convert the allegations above – which are all based on circumstantial evidence – into direct allegations that the Committee employed a flawed process.  *See* Opp. at 8, ECF No. 85.  Plaintiffs allege that the Plan's third-party investment advisor, Precept Advisory Group ("Precept"), likely considered the benchmarks and other metrics discussed above and would have shared this information with the Committee during the relevant period.  *See* FAC ¶¶ 84-85.  This argument only works if the American Century TDFs were poor investments based

---

[8] *Cf. Hughes*, 595 U.S. at 174 (defendants offered "'retail' share classes that carried higher fees than those charged by otherwise identical 'institutional' share classes of the same investments, which are available to certain large investors"); *Tibble II*, 843 F.3d at 1198 (similar); *Salesforce.com*, 2022 WL 1055557, at *1  (reversing dismissal where defendants failed to "switch to the lower-cost alternatives" that were the same in every other respect); *Kong v. Trader Joe's Co.*, No. 20-cv-56415, 2022 WL 1125667, at *1 (9th Cir. Apr. 15, 2022) (reversing dismissal where defendants invested in "'retail' share classes that carried higher fees than those charged by otherwise identical 'institutional' share classes of the same investments"); *Johnson v. Parker-Hannifin Corp.*, 122 F.4th 205, 211 (6th Cir. 2024) (similar); *Davis*, 960 F.3d at 483 (reversing dismissal where defendants failed to "replace these shares with their lower-cost counterparts" that were otherwise identical); *Meiners*, 898 F.3d at 823.

on these benchmarks and metrics – but they were not. To the contrary, Plaintiffs allege that the American Century TDFs earned positive returns and frequently performed above median compared to the Morningstar peer group. *See supra* Section IV.A.1.a. Plaintiffs allege that a fund's "performance vs. peer group" is one of the key considerations that Precept likely considered. FAC ¶¶ 83, 102-104. Ultimately, the Court cannot infer that the Committee ignored adverse information from its investment advisor when the complaint alleges that much of the information provided to the Committee was favorable.

*** 

At the motion hearing, Plaintiffs suggested that the Court has applied an overly stringent standard. Not so. Binding case law requires "careful judicial consideration of whether [a] complaint states a claim" for breach of the duty of prudence. *Fifth Third Bancorp*, 573 U.S. at 425; *see also Anderson*, 137 F.4th at 1021. Here, Plaintiffs' allegations of imprudence are fundamentally insufficient. Taken as a whole, at most, the complaint alleges that the American Century TDFs yielded lower returns than other investments at times, but also frequently performed above median – particularly during market downturns. These outcomes were consistent with the American Century TDFs' risk mitigation strategy and investment objectives. Plaintiffs have not alleged any facts to suggest that the Committee's investment strategy was beyond the "range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes*, 595 U.S. at 177. Although Plaintiffs might have preferred taking on more risk to chase higher potential returns, "ERISA fiduciaries are not required to adopt a riskier strategy simply because that strategy may increase returns." *Anderson*, 137 F.4th at 1024. The allegations in the fourth amended complaint do not suggest that the Committee acted imprudently in selecting or retaining the American Century TDFs within the Plan. *See id.* at 1021. Accordingly, the Court GRANTS Defendants' motion to dismiss Plaintiffs' claim for breach of the duty of prudence.

### B.    Failure to Monitor

"[P]laintiffs' duty-to-monitor claim is derivative of their duty-of-prudence claim." *Salesforce.com*, 2022 WL 1055557, at *2; *see also* Mot. at 25 (conceding this point). Because

Plaintiffs fail to allege a breach of the duty of prudence, the Court also GRANTS Defendants' motion to dismiss Plaintiffs' claim for failure to monitor.

***

The complaint has been amended four times already, and Plaintiffs' allegations have been deemed legally deficient three times. In the Order dismissing the third amended complaint, the Court warned that failure to cure pleading deficiencies "will result in dismissal of Plaintiffs' deficient claims with prejudice." Second MTD Order at 6. Because Plaintiffs have repeatedly failed to cure pleading deficiencies, the Court finds that further leave to amend would be futile. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009), *as amended* (Feb. 10, 2009) (holding that failure to correct pleading deficiencies after dismissal is a "strong indication" that further amendment would be futile); *see also Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013) ("A district court's discretion to deny leave to amend is 'particularly broad' where the plaintiff has previously amended." (quoting *Sisseton-Wahpeton Sioux Tribe v. United States*, 90 F.3d 351, 355 (9th Cir. 1996))). Accordingly, Plaintiffs' claims for breach of the duty of prudence and failure to monitor are dismissed without leave to amend.

### C.    Failure to Furnish Documents

ERISA § 104(b)(4) provides that: "The administrator [of a plan] shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or *other instruments under which the plan is established or operated*." 29 U.S.C. § 1024(b)(4) (emphasis added). Any plan administrator who "fails or refuses to comply with a request" for such information "may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $[110] a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper." *Id.* § 1132(c)(1).

Here, Plaintiffs claim that Defendants failed to furnish the Plan's Investment Policy Statement ("IPS"). On April 28, 2022, "in an attempt to discover the details of the Plan's mismanagement, Plaintiffs wrote to [Defendants] . . . to request, among other things, 'all written

18

instruments' governing or pertaining to the Plan, including 'investment policy statements.'" FAC ¶ 65. "Cobham did not produce an investment policy statement." *Id*. ¶ 66. Defendants have since "admitted to having" an IPS for the Plan. *Id*. ¶ 230. Thus, the critical question is whether the Plan's IPS is an "instrument[] under which the plan is established or operated," in which case, it must be furnished to Plaintiffs.[9]

The Ninth Circuit has not squarely addressed whether ERISA § 104(b)(4) requires disclosure of a plan's IPS. However, the Ninth Circuit has construed § 104(b)(4) in several published opinions, which guide the Court's analysis here. *See Hughes Salaried Retirees Action Comm. v. Adm'r of Hughes Non-Bargaining Ret. Plan*, 72 F.3d 686 (9th Cir. 1995) (en banc); *Shaver v. Operating Eng'rs Local 428 Pension Tr. Fund*, 332 F.3d 1198 (9th Cir. 2003).

In *Hughes*, the plaintiffs requested a list of "the names and addresses of other plan participants" so the plaintiffs could communicate with them "about matters of concern to all retired participants regarding their pensions." *Hughes*, 72 F.3d at 688. The Ninth Circuit held that a list of plan participants is not an "instrument[] under which the plan is established or operated." *Id*. The Ninth Circuit applied the canon that "words grouped in a list should be given related meaning." *Id*. at 689 (quoting *Massachusetts v. Morash*, 490 U.S. 107, 114-15 (1989)). Thus, the scope of the "other instruments" clause must be "limited to documents that are similar in nature to the documents specifically listed" – that is, "plan descriptions, annual and terminal reports, and bargaining and trust agreements." *Id*. at 690-91. These listed documents are all similar in that they "provide individual participants with information about the plan and benefits." *Id*. at 690. Because "participants' names and addresses provide no information about the plan or benefits," this information fell outside the scope of ERISA § 104(b)(4). *Id*.

---

[9] The fourth amended complaint is the first time that Plaintiffs asserted a claim for violation of ERISA § 104(b)(4) based on Defendants' failure to produce the IPS. At the previous motion-to-dismiss hearing, Defendants acknowledged that there is an IPS for the Plan. 12/18/24 Hr'g Tr. 9:9-14, ECF No. 71. Plaintiffs then requested production of the IPS and other materials. Pls.' Supp. Br. at 3, ECF No. 69. The Court denied that request because "Plaintiffs' allegations have been dismissed twice for failure to plausibly state a claim," and the Court lacked discretion to permit discovery on the dismissed claims. *See* Second MTD Order at 5 (citing *Mujica v. AirScan Inc.*, 771 F.3d 580, 593 n.7 (9th Cir. 2014)).

United States District Court
Northern District of California

In *Shaver*, the plaintiffs were concerned about the management of their pension fund and sought "detailed records of expenditures." *Shaver*, 332 F.3d at 1199-1200. As in *Hughes*, the Ninth Circuit reasoned that "the broad term, 'other instruments,' should be limited to the class of objects that specifically precedes it." *Id*. at 1202. The Ninth Circuit explained that the documents enumerated in ERISA § 104(b)(4) are "legal documents that describe the terms of the plan, its financial status, and other documents that restrict or govern the plan's operation." *Id*.; *see also Becker v. Williams*, 777 F.3d 1035, 1039 n.2 (9th Cir. 2015) (noting that ERISA § 104(b)(4) encompasses "only formal documents that govern the operation of the plan"). By contrast, the detailed records of expenditures sought by the plaintiffs did not qualify as "other instruments" because the records "at most relate to the manner in which the plan is operated." *Shaver*, 332 F.3d at 1202.

Here, under *Hughes* and *Shaver*, Plaintiffs plausibly allege that the Plan's IPS is a document that restricts or governs the Plan's operation. Plaintiffs allege that the Plan's Charter requires the Committee to: "(i) adopt an Investment Policy for the Plan, review it periodically and update the Investment Policy when applicable; [and] (ii) review and monitor the investment performance of the Plan and oversee compliance with the Investment Policy[.]" FAC ¶ 29. Although an ERISA plan is not required by statute to have an IPS,[10] here, the Plan's Charter mandates one, and the Committee's investments must comply with the IPS. *See id*. ¶ 229. Therefore, in this case, the IPS restricts or governs an important aspect of the Plan's operation: the Committee's process for selecting and retaining investments offered through the Plan.

This conclusion accords with the Fourth Circuit's reasoning in *Faircloth v. Lundy Packing Co.*, 91 F.3d 648 (4th Cir. 1996) – the only appellate decision that directly addresses whether an IPS must be furnished under ERISA § 104(b)(4). In *Faircloth*, beneficiaries of an employee stock option plan ("ESOP") experienced a drop in their account balances, then requested certain

---

[10] ERISA requires that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument." 29 U.S.C. § 1102(a)(1). ERISA identifies certain "requisite" and "optional" features of a plan. Although ERISA does not identify an IPS among these features, that does not preclude a plan from adopting a binding IPS, as allegedly happened here.

United States District Court
Northern District of California

documents from their plan administrator, "including any investment policy." *Id*. at 651-52. The Fourth Circuit reasoned that the key statutory language – "other instruments under which the plan is established or operated" – is "clear and unambiguous." *Id*. at 653; *see also M.S. v. Premera Blue Cross*, 118 F.4th 1248, 1267-68 (10th Cir. 2024) (same). The Fourth Circuit construed "instrument" to mean a "formal or legal document," and construed "operate" as "to conduct or direct the affairs of (a business, etc.); manage." *Faircloth*, 91 F.3d at 653 (first quoting Black's Law Dictionary 801 (6th ed. 1990); and then quoting Webster's New World Dictionary 948 (3d college ed. 1991)). Applying this construction, the Fourth Circuit held that the investment policy statement was a "formal document[] under which the ESOP is managed" because it "explain[s] the responsibilities regarding investing the assets of the ESOP." *Id*. at 656.[11] The Court finds *Faircloth* persuasive and consistent with the Ninth Circuit's narrow construction of the statutory language.[12]

At the motion hearing, Defendants raised three arguments. First, Defendants argued that the Court's conclusion is inconsistent with the Ninth Circuit's reasoning in *Hughes*. In *Hughes*, the Ninth Circuit rejected a broad construction of ERISA § 104(b)(4), which would have required disclosure of all documents "critical to the operation of the plan." *Hughes*, 72 F.3d at 690. The Ninth Circuit held that this standard offered "no limiting principle." Here, the Court does not hold that any document relating to a plan's operation must be furnished. Rather, consistent with both *Hughes* and *Shaver*, the Court holds that an instrument that *governs* or *restricts* a plan's operation falls within the scope of ERISA § 104(b)(4). Second, Defendants argued that the IPS does not provide information about the Plan or benefits under *Hughes*. But the Plan at issue is a 401(k)

---

[11] Plaintiffs also rely on *Trustees of N.Y. State Nurses Association Pension Plan v. White Oak Global Advisors, LLC*, 102 F.4th 572 (2d Cir. 2024). But *White Oak* addressed a different type of document and a different statutory provision of ERISA. *See id*. at 597 (holding that "the investment management agreement contemplated by ERISA § 3(38) is a document that governs the plan, such that non-compliance with its terms is a breach of fiduciary duty").

[12] In *Faircloth*, the Fourth Circuit discussed the Ninth Circuit's *Hughes* decision. It seems that the Fourth Circuit viewed its own construction of the statutory language as even narrower than the Ninth Circuit's construction in *Hughes*. *See Faircloth*, 91 F.3d at 653-54. The Ninth Circuit has favorably cited *Faircloth*, calling the Fourth Circuit's construction "similar[]" to the Ninth Circuit's construction in *Hughes*. *Becker*, 777 F.3d at 1039 n.2.

United States District Court
Northern District of California

1    retirement plan; the criteria used to invest participants' contributions is core information about the

2    Plan.  Finally, Defendants argued that the IPS restricts the Committee, not the Plan itself.  But this

3    is a distinction without a difference because it is the Committee that operates the Plan.  FAC

4    ¶ 23.[13]

5          In sum, when a plan's fiduciary formally adopts an IPS, and when the fiduciary is required

6    to comply with it when making investment decisions, the IPS is an "instrument[] under which the

7    plan is . . . operated."  Here, Plaintiffs plausibly allege that the Plan's IPS satisfies these criteria.

8    Accordingly, Plaintiffs plausibly state a claim under ERISA § 104(b)(4).[14]

9    **V.    CONCLUSION**

10          For the foregoing reasons, the Court GRANTS Defendants' motion to dismiss Plaintiffs'

11    claims for breach of the fiduciary duty of prudence and failure to monitor (Counts 1 and 2)

12    without leave to amend.  These claims are DISMISSED with prejudice.  The Court DENIES

13    Defendants' motion to dismiss Plaintiffs' claim for failure to furnish the Plan's IPS (Count 3).

14          **IT IS SO ORDERED.**

15    Dated:  September 19, 2025

16

17                                                              _____

18                                                              Eumi K. Lee
                                                                United States District Judge

19

20

21

22

23

---

24    [13] Defendants make two other arguments regarding the ERISA § 104(b)(4) claim.  They argue that
      Cobham is the only Defendant that could be liable, Mot. at 22-23, and that even if Plaintiffs state a

25    claim, they are "not entitled to any penalties," Reply at 14, ECF No. 86.  These arguments raise
      issues that are not adequately presented on the current record, including whether Cobham

26    delegated its statutory duties to the Board or the Committee.  *See* Opp. at 25.

27    [14] At the motion hearing, Plaintiffs asked the Court to grant them injunctive relief in this Order by
      requiring Defendants to produce the Plan's IPS.  But the only issue presently before the Court is

28    whether Plaintiffs plausibly stated a claim.  Ordering injunctive relief involves different
      considerations.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 24 (2008).

United States District Court
Northern District of California